**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| ┌ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ┐ ) | |
| MICHAEL TERRILL, ROBERT BROWN, ) | |
| MICHAEL VOGLER, PALECIA BOYD, ) | |
| AND DENISE PACK on behalf of ) | |
| themselves and all others similarly situated, ) | |
| ) | CASE NO:  CV108-030 |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ELECTROLUX HOME PRODUCTS, INC. ) | |
| d/b/a FRIGIDAIRE®, ) | |
| ) | |
| Defendant. ) | |
| └ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ┘ ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION**
**FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

<u>**PAGES**</u>

BACKGROUND ................................................................................................................1

    I.     THE NAMED PLAINTIFFS.........................................................................3

         A.    Ms. Boyd...........................................................................................3

         B.    Mr. Terrill ........................................................................................3

         C.    Ms. Pack...........................................................................................4

         D.    Mr. Vogler........................................................................................4

         E.    Mr. Brown ........................................................................................4

    II.    FRONT LOAD WASHERS.........................................................................5

    III.   ELECTROLUX'S CUSTOMER SERVICE EXPERIENCES WITH THE
         SUBJECT WASHING MACHINES ...........................................................9

ARGUMENT..................................................................................................................12

    I.     PLAINTIFFS' PROPOSED CLASS DEFINITION IS IMPERMISSIBLY
         OVERBROAD. ..........................................................................................14

    II.    PLAINTIFFS' NATIONWIDE CLASS PROPOSAL FAILS THE
         PREDOMINANCE AND SUPERIORITY REQUIREMENTS FOR
         CLASS CERTIFICATION. ........................................................................16

         A.    Under Georgia's Choice-Of-Law Rules, The Law Of Each Putative
             Class Member's Home State Governs His Or Her Claims.......................17

             1.    Plaintiffs' Consumer Fraud And Warranty Claims Are
                 Statutory In Nature....................................................................17

             2.    Georgia Law Cannot Be Universally Applied To Plaintiffs'
                 Unjust Enrichment Claims. .......................................................20

         B.    The Need To Apply Multiple States' Laws Defeats Both
             Predominance And Superiority. ............................................................23

    III.   PLAINTIFFS' CLAIMS TURN ON HIGHLY INDIVIDUALIZED
         PROOF, PRECLUDING CERTIFICATION OF THEIR ALTERNATIVE
         STATEWIDE CLASSES.............................................................................28

A.    Plaintiffs' "Defect" Claims – Which Underlie All Their Causes Of Action – Turn On Highly Individualized Evidence. ...............................29

B.    Plaintiffs' Consumer Fraud Claims Also Turn On Other Highly Individualized Evidence. ........................................................33

        1.    Electrolux's Statements About The Washers Varied...................33

        2.    Plaintiffs' Statutory Consumer Protection Claims Require Highly Individualized Proof Of Causation And/Or Reliance. ..........................................................................34

C.    Plaintiffs' Warranty Claims Similarly Turn On Other Individualized Evidence. ........................................................38

        1.    Plaintiffs Must Present Individualized Evidence Of Notice To Prevail On Their Express And Implied Warranty Claims. ..........................................................................38

        2.    Plaintiffs' Express Warranty Claims Turn On Additional Individualized Inquiries............................................................43

                (a)    Plaintiffs Must Each Prove Individually That Their Machines Malfunctioned Within The One-Year Warranty Period. ...........................................................43

                (b)    Plaintiffs Must Prove Individually That Electrolux Failed To Repair Any Allegedly Defective Parts On Their Machines............................................................45

                (c)    Under Many States' Laws, Plaintiffs Would Have To Make Individualized Showings Of Reliance. ..............47

D.    Plaintiffs' Unjust Enrichment Claims Are Similarly Individualized. .......47

E.    Electrolux's Affirmative Defenses Present Additional Individualized Issues. ...........................................................50

IV.    PLAINTIFFS CANNOT SATISFY RULE 23'S TYPICALITY AND ADEQUACY REQUIREMENTS WITH RESPECT TO THEIR WARRANTY CLAIMS....................................................................51

CONCLUSION...............................................................................54

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ackerman v. Wyeth Pharms.*,
   471 F. Supp. 2d 739 (E.D. Tex. 2006)............................................................47

*In re Air Bag Prods. Liab. Litig.*,
   7 F. Supp. 2d 792, 804 (E.D. La. 1998)........................................................42

*Almonor v. Bankatlantic Bancorp, Inc.*,
   No. 07-61862-CIV, 2009 U.S. Dist. LEXIS 67598 (S.D. Fla. July 28, 2009)................14

*In re Am. Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir. 1996)...............................................................17, 23

*Andrade v. Pangborn Corp.*,
   No. C 02-3771, 2004 U.S. Dist. LEXIS 22704 (N.D. Cal. Oct. 22, 2004).....................39

*Andrews v. AT&T*,
   95 F.3d 1014 (11th Cir. 1996)..........................................................16, 23, 36

*Angel v. Goodman Mfg. Co., L.P.*,
   617 F. Supp. 2d 1120 (N.D. Okla. 2008)...............................................52, 53

*Asplundh Tree Expert Co. v. Emeritis LLC*,
   No. 1:06-cv-432, 2006 U.S. Dist. LEXIS 45581 (N.D. Ga. June 27, 2006) ..................20

*Babineau v. Fed. Express Corp.*,
   576 F.3d 1183 (11th Cir. 2009)................................................................28

*Bailey v. Monaco Coach Corp.*,
   350 F. Supp. 2d 1036 (N.D. Ga. 2004).........................................................19

*Barbarin v. Gen. Motors Corp.*,
   No. 84-0888, 1993 U.S. Dist. LEXIS 20980 (D.D.C. Sept. 22, 1993)...........................38

*Basic, Inc. v. Levinson*,
   485 U.S. 224, 242 (1988)......................................................................36

*In re Baycol Prods. Litig.*,
   218 F.R.D. 197 (D. Minn. 2003)...............................................................27

*Beck v. Prupis*,
   162 F.3d 1090 (11th Cir. 1998)................................................................36

*Bishop's Prop. & Invs., LLC v. Protective Life Ins. Co.*,
    255 F.R.D. 619 (M.D. Ga. 2009) ........................................................ 16, 23

*Boca Raton Cmty. Hosp. v. Tenet Healthcare Corp.*,
    238 F.R.D. 679 (S.D. Fla. 2006) ................................................................52

*Brenner v. Future Graphics, LLC*,
    258 F.R.D. 561 (N.D. Ga. 2007) ...............................................................21

*In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*,
    288 F.3d 1012 (7th Cir. 2002)...........................................................passim

*Briehl v. GMC*,
    172 F.3d 623 (8th Cir. 1999).........................................................29, 32, 46

*Brookings Mun. Utils., Inc. v. Amoco Chem. Co.*,
    103 F. Supp. 2d 1169 (D.S.D. 2000) .........................................................42

*Brothers v. Hewlett-Packard Co.*,
    No. C-06-02254, 2007 U.S. Dist. LEXIS 13155 (N.D. Cal. Feb. 12, 2007) .............45, 46

*Caruso v. Celsius Insulation Res., Inc.*,
    101 F.R.D. 530 (M.D. Pa. 1984).........................................................39, 47

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996).............................................................23, 25

*Chatham v. Sears, Roebuck & Co., In re Sears, Roebuck & Co. Mktg. &
    Sales Practices Litig.*,
    No. MDL 1703, 2007 U.S. Dist. LEXIS 89349 (N.D. Ill. Dec. 4, 2007)........................14

*Clay v. Am. Tobacco Co.*,
    188 F.R.D. 483 (S.D. Ill. 1999).........................................................27, 48

*Cohen v. Implant Innovations, Inc.*,
    259 F.R.D. 617 (S.D. Fla. 2008) ...............................................................39

*Cole v. GMC*,
    484 F.3d 717 (5th Cir. 2007)........................................................24, 25, 30

*Colomar v. Mercy Hosp., Inc.*,
    242 F.R.D. 671 (S.D. Fla. 2007) ...............................................................51

*In re ConAgra Peanut Butter Prods. Liab. Litig.*,
    251 F.R.D. 689 (N.D. Ga. 2008) ...........................................................22, 27

*Cox House Moving, Inc. v. Ford Motor Co.*,
   No. 7:06-1218-HMH, 2006 U.S. Dist. LEXIS 81132 (D.S.C. Nov. 6, 2006) .................32

*Cunningham Charter Corp. v. Learjet, Inc.*,
   258 F.R.D. 320 (S.D. Ill. 2009)......................................................................... 14, 46

*Danielson v. DBM, Inc.*,
   No. 1:05-cv-2091-WSD, 2007 U.S. Dist. LEXIS 18609 (N.D. Ga. Mar. 15,
   2007). ...................................................................................................... 26, 39, 51

*In re GMC Anti-Lock Brake Prods. Liab. Litig.*,
   966 F. Supp. 1525 (E.D. Mo. 1997) ...........................................................................46

*Gable v. Land Rover N. Am., Inc.*,
   No. CV07-0376, 2008 U.S. Dist. LEXIS 82996 (C.D. Cal. Sept. 29, 2008)...................30

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*,
   241 F.R.D. 305 (S.D. Ill. 2007)............................................................................26, 38

*Gen Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ................................................................................................13

*Gilbert v. Monaco Coach Corp.*,
   352 F. Supp. 2d 1323 (N.D. Ga. 2004)........................................................................18

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003)......................................................................................36

*In re HealthSouth Corp. Sec. Litig.*,
   257 F.R.D. 260 (N.D. Ala. 2009) .................................................................. 12, 13, 28

*Helena Chem. Co. v. Huggins*,
   No. 4:06-cv-2583-RBH, 2008 U.S. Dist. LEXIS 92449 (D.S.C. Nov. 13, 2008) ...... 33, 35

*Hillis v. Equifax Consumer Servs.*,
   237 F.R.D. 491 (N.D. Ga. 2006) ................................................................................51

*Hines v. Mercedes-Benz USA, LLC*,
   358 F. Supp. 2d 1222 (N.D. Ga. 2005)........................................................................26

*Hively v. Northlake Foods, Inc.*,
   191 F.R.D. 661, 668 (M.D. Fla. 2000) .......................................................................52

*Hobbs v. GMC*,
   134 F. Supp. 2d 1277 (M.D. Ala. 2001) ......................................................................42

*Hovsepian v. Apple, Inc.*,
    No. 08-5788, 2009 U.S. Dist. LEXIS 117562 (N.D. Cal. Dec. 17, 2009)........................15

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)...........................................................................................13

*Imps. Serv. Corp. v. GP Chems. Equity, LLC*,
    No. 1:07-CV-0745-JOF, 2009 U.S. Dist. LEXIS 74994 (N.D. Ga. Aug. 24, 2009)........40

*Kaczmarek v. IBM Corp.*,
    186 F.R.D. 307 (S.D.N.Y. 1999).....................................................................................26

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987).....................................................................................21, 23

*Lewis v. Mercedes-Benz USA, LLC*,
    No. 1:03-cv-4000, 2004 U.S. Dist. LEXIS 29484 (N.D. Ga. Sept. 13, 2004)...... 38, 41, 53

*Lindquist Ford, Inc. v. Middleton Motors, Inc.*,
    557 F.3d 469 (7th Cir. 2009)..........................................................................................48

*Luigino's Int'l, Inc. v. Miller*,
    311 F. App'x 289 (11th Cir. 2009) ............................................................................18, 20

*Luna v. Del Monte Fresh Produce (Southeast), Inc.*,
    No. 09-12464, 2009 U.S. App. LEXIS 26421 (11th Cir. Dec. 3, 2009) .........................28

*Mauro v. GMC*,
    No. CIV. S-07-892 FCD GGH, 2008 U.S. Dist. LEXIS 93897 (E.D. Cal. July 14,
    2008)..............................................................................................................................46

*McBride v. Galaxy Carpet Mills, Inc.*,
    920 F. Supp. 1278 (N.D. Ga. 1995)................................................................................26

*McGown v. Bridgestone/Firestone, Inc.*,
    No. 9:05-CV-9, 2005 U.S. Dist. LEXIS 25598 (E.D. Tex. Oct. 18, 2005) .....................39

*Mgmt. Science Am., Inc. v. NCR Corp.*,
    765 F. Supp. 738 (N.D. Ga. 1991) ..................................................................................20

*In re Microsoft Xbox 360 Scratched Disc Litigation*,
    No. C07-1121, 2009 U.S. Dist. LEXIS 109075 (W.D. Wash. Oct. 5, 2009) ....... 30, 31, 32

*Montgomery v. New Piper Aircraft, Inc.*,
    209 F.R.D. 221 (S.D. Fla. 2002) ....................................................................................25

*Monticello v. Winnebago Indus., Inc.*,
    369 F. Supp. 2d 1350 (N.D. Ga. 2005)..........................................................18

*Munson v. Strategis Asset Valuation & Mgmt.*,
    363 F. Supp. 2d 1377 (N.D. Ga. 2005)..........................................................50

*Nafar v. Hollywood Tanning Sys., Inc.*,
    No. 08-3994, 2009 U.S. App. LEXIS 17561 (3d Cir. Aug. 5, 2009).............35

*O'Neil v. Simplicity, Inc.*,
    553 F. Supp. 2d 1110 (D. Minn. 2008)..........................................................29

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006).................................................... 14, 15, 36, 48

*Parks Auto. Group, Inc. v. Gen. Motors Corp.*,
    237 F.R.D. 567 (D.S.C. 2006).......................................................................51

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ......................................................................................22

*Picus v. Wal-Mart Stores, Inc.*,
    256 F.R.D. 651 (D. Nev. 2009)......................................................................35

*Poe v. Sears, Roebuck & Co.*,
    No. CivA1:96-CV-358, 1998 WL 113561 (N.D. Ga. Feb. 13, 1998) ......................20, 23

*Port Elevator Brownsville, L.C. v. Gutierrez*,
    198 F. App'x 362 (5th Cir. 2006) ................................................................33

*In re Prempro Prods. Liab. Litig.*,
    230 F.R.D. 555 (E.D. Ark. 2005) ................................................................27

*In re Rezulin Products Liability Litigation*,
    210 F.R.D. 61, 64 (S.D.N.Y. 2002)...............................................................49

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
    211 F.3d 1228 (11th Cir. 2000)......................................................................13

*Sanders v. Johnson & Johnson, Inc.*,
    No. 03-2663, 2006 U.S. Dist. LEXIS 35881 (D.N.J. May 31, 2006) .............24

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
    No. 1703, 2007 WL 4287511 (N.D. Ill. Dec. 4, 2007) ..................................27

*Shelley v. AmSouth Bank,*
    No. 97-1170-RV-C, 2000 U.S. Dist. LEXIS 11429 (S.D. Ala. July 25, 2000) ...............52

*Silverstein v. P&G Mfg. Co.,*
    No. CV 108-003, 2008 U.S. Dist. LEXIS 91559 (S.D. Ga. Nov. 12, 2008) ....... 29, 33, 35

*Spence v. Glock,*
    227 F.3d 308 (5th Cir. 2000)......................................................................................26

*St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone,*
    572 F.3d 893 (11th Cir. 2009)....................................................................................17

*Sweet v. Pfizer,*
    232 F.R.D. 360 (C.D. Cal. 2005) ...............................................................................24

*In re Tri-State Crematory Litig.,*
    215 F.R.D. 660 (N.D. Ga. 2003)................................................................................21

*Vega v. T-Mobile USA, Inc.,*
    564 F.3d 1256 (11th Cir. 2009)..................................................................................24

*Walsh v. Ford Motor Co.,*
    130 F.R.D. 260 (D.D.C. 1990) ..................................................................................26

*Walsh v. Ford Motor Co.,*
    807 F.2d 1000 (D.C. Cir. 1986) .................................................................................25

*Weaver v. Chrysler Corp.,*
    172 F.R.D. 96 (S.D.N.Y. 1997)..................................................................................29

## STATE CASES

*Am. Suzuki Motor Corp. v. Super. Ct.,*
    37 Cal. App. 4th 1291 (1995).....................................................................................30

*Avery v. State Farm Mut. Auto. Ins. Co.,*
    835 N.E.2d 801 (Ill. 2005) .........................................................................................22

*Barbara's Sales, Inc. v. Intel Corp.,*
    879 N.E.2d 910 (Ill. 2007) .........................................................................................22

*Cardinal Health 301, Inc. v. Tyco Elecs. Corp.,*
    87 Cal. Rptr. 3d 5 (Cal. Ct. App. 2008) .....................................................................53

*Compaq Computer Corp. v. Lapray,*
    135 S.W.3d 657 (Tex. 2004) ......................................................................................22

*Connick v. Suzuki Motor Co.*,
   675 N.E.2d 584 (Ill. 1996) ...................................................... 42

*Cosman v. Ford Motor Co.*,
   674 N.E.2d 61, 66 (Ill. 1996) ................................................. 45

*De Bouse v. Bayer AG*,
   No. 107528, 2009 Ill. LEXIS 2306 (Ill. Dec. 17, 2009).................... 36

*Debbs v. Chrysler Corp.*,
   810 A.2d 137 (Pa. Super. Ct. 2002) ......................................... 35

*Fieldstone Co. v. Briggs Plumbing Prods., Inc.*,
   54 Cal. App. 4th 357, 370-71 (Cal. Ct. App. 1997) ........................ 54

*Fort Oglethorpe Assocs. II, Ltd. v. Hails Constr. Co. of Ga.*,
   396 S.E.2d 585 (Ga. Ct. App. 1990) ......................................... 44

*Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*,
   684 S.E.2d 756 (S.C. 2009) .................................................... 48

*Henry Schein, Inc. v. Stromboe*,
   102 S.W.3d 675 (Tex. 2002) .................................................. 35

*Hitachi Elec. Devices (USA), Inc. v. Platinum Techs., Inc.*,
   621 S.E.2d 38 (S.C. 2005) ................................................ 39, 53

*Hudson v. Gaines*,
   403 S.E.2d 852 (Ga. Ct. App. 1991) ......................................... 42

*Huynh v. Ingersoll-Rand*,
   16 Cal. App. 4th 825 (Cal. Ct. App. 1993) .................................. 50

*IBM Corp. v. Kemp*,
   244 Ga. App. 638 (2000) ................................................. 18, 20

*Knight v. Am. Suzuki Motor Corp.*,
   612 S.E.2d 546 (Ga. Ct. App. 2005) ...................................... 45, 53

*Lopez v. Smith Corona, Inc.*,
   No. 07-99-0272-CV, 2000 WL 798799 (Tex. App. June 21, 2000) ............. 44

*Oden & Sims Used Cars, Inc. v. Thurman*,
   301 S.E.2d 673 (Ga. Ct. App. 1983) .................................. 39, 40, 41

*Pollard v. Saxe & Yolles Dev. Co.*,
    525 P.2d 88 (Cal. 1974) ..................................................................54

*Risdon Enters., Inc. v. Colemill Enters., Inc.*,
    172 Ga. App. 902 (1984) ............................................................18, 19

*Schroeder v. Drees*,
    83 N.W.2d 707 (Wis. 1957) ..........................................................54

*Servais v. Philbrick*,
    380 S.E.2d 496, 497 (Ga. Ct. App. 1989) ....................................47

*SunTrust Bank v. Hightower*,
    660 S.E.2d 745 (Ga. Ct. App. 2008) ............................................42

*Tegen v. Chapin*,
    187 N.W. 185 (Wis. 1922) ............................................................54

*Tietsworth v. Harley-Davidson, Inc.*,
    677 N.W.2d 233 (Wis. 2004) ....................................................33, 35

*Wilcox v. Hillcrest Mem'l Park*,
    696 S.W.2d 423 (Tex. App. 1985) ................................................41

*Wilens v. TD Waterhouse Group, Inc.*,
    120 Cal. App. 4th 746 (Cal. App. 2003) ......................................33

*Wilson v. Tuxen*,
    754 N.W.2d 220 (Wis. Ct. App. 2008) ..........................................53

## FEDERAL RULE

Fed. R. Civ. P. 23(b) ......................................................................28

## STATE STATUTES

Cal. Com. Code § 2101 *et seq* ......................................................18

Ga. Code Ann. § 11-2-101 *et seq* ..................................................18

S.C. Code Ann. § 36-2-101 *et seq* ................................................18

Tex. Bus. & Com. Code § 2.101 *et seq* ..........................................18

Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(A)-(B) (Vernon 2009) ............................................35

Wis. Stat. Ann. § 402.101 *et seq* ...................................................................18

Wis. Stat. Ann. § 402.607(3) ........................................................................39

Wyo. Stat. Ann. § 40-12-108(a) (2009) .........................................................35

## MISCELLANEOUS

*Consumer Reports Buying Guide*, Washing Machines, at 80 (2006) ...........................................7

*Consumer Reports Buying Guide*, Washing Machines, at 77 (2007) ...........................................7

Lisa Davis, "Woman vs. Washing Machine," *The Anniston Star* (Anniston, Ala.), Oct. 4, 2009, at 31 .....................................................................37

Jane Greig, "Consumer Q&A," *Cox News Service*, Jul. 24, 2006 .................................................8

Glenn Haege, "Get Rid of Stinky Fungus in That Front-Loading Washer," *The Detroit News*, June 9, 2007, at 14H .................................................................8

Glenn Haege, "Professional Waxes Help Wood Floors," *The Detroit News*, Nov. 28, 2007, at 3E .......................................................................8

Jean Patterson, "Clean Out Washer For Fresh Towels," *Daily Press* (Newport News, Va.), Aug. 16, 2007, at D2 ...............................................................8

"Washer & Dryer Update," *Consumer Reports*, Feb. 2005 at 42 ...........................................6, 7

"Washers & Dryers: Performance For Less," *Consumer Reports*, Feb. 2008, at 45 ....................7

Sheba R. Wheeler, "Your Washer Can Need Cleaning Tablets [*sic*] Result In A Sweet-Smelling Machine," *The Seattle Post-Intelligencer*, Jan 12, 2008, at C3 .........................8

James J. White & Robert S. Summers, *Uniform Commercial Code* § 3 (2d ed. 1980) ..............25

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**

Plaintiffs are asking the Court to hold one trial that purports to resolve the "claims" of all individuals nationwide who have purchased a variety of different models of front load washing machines over the last four years.  (Pls.' Mot. at 1.)  This proposal should be rejected.

The proposed class members do have one thing in common:  they all own washing machines.  Beyond that superficial similarity, however, their claims vary in myriad ways.  They purchased their washing machines in different states, and their claims are therefore governed by different states' laws.  Many of them purchased machines that did not even contain the part that plaintiffs claim was defective.  They used and cared for their washing machines in different ways and had varying levels of satisfaction with them.  Only a small percentage of putative class members ever complained to the Company about mildew or mold in their machines.  And those individuals who did experience problems with their washing machines took different approaches to reporting those problems to Electrolux and received different responses from the Company when they did.

For these and other reasons, plaintiffs' claims cannot be fairly tried in one class trial, and their motion for class certification should be denied.

## BACKGROUND

Plaintiffs are five individuals – from Georgia, Wisconsin, South Carolina, Texas, and California – who each purchased a Frigidaire front load washing machine and allegedly experienced various mold and mildew problems with their machines.[1]  Plaintiffs claim that several models of Frigidaire washing machines are defective in that they "share an identical

---

[1]    Frigidaire is a registered trademark of Electrolux.

design flaw in the form of a gasket that has convolutions in which water accumulates after running a wash cycle." (Pls.' Mot. at 1.) Plaintiffs further claim that "the accumulation of water in the gasket causes mold and mildew to form inside the washing machine." (*Id.*) According to plaintiffs, Electrolux "failed to inform customers" of the alleged defect in their machines and refuses to replace or repair the allegedly defective part. (*Id.* at 3.) Based on these allegations, plaintiffs assert claims for alleged violations of the Georgia Uniform Deceptive Trade Practices Act (Am. Compl. Count I, ¶¶ 46-49), breach of express warranty (*id.* Count II, ¶¶ 50-53), breach of the implied warranty of merchantability (*id.* Count III, ¶¶ 54-61), unjust enrichment (*id.* Count IV, ¶¶ 62-67), violations of the Magnuson-Moss Act (*id.* Count V, ¶¶ 68-76), violations of the California Unfair Competition Law (*id.* Count VI, ¶¶ 77-84), violations of the Texas Deceptive Trade Practices-Consumer Protection Act (*id.* Count VII, ¶¶ 85-92), and violations of the Wisconsin Deceptive Trade Practices Act (*id.* Count VIII, ¶¶ 93-100). Plaintiffs seek "actual, general, special, incidental, statutory, and consequential damages," injunctive relief and attorneys' fees. (*Id.*, Prayer For Relief.)

Plaintiffs seek certification of a proposed class composed of "[a]ll persons and entities in the United States who purchased, other than for resale," one or more Frigidaire front load washing machines during the previous four (4) years.[2] (*Id.* ¶ 19.)

---

[2] The precise class period is somewhat ambiguous because plaintiffs included the same class definition with the same reference to the "previous four years" in both the original Complaint (filed March 5, 2008) and their Amended Complaint (filed July 31, 2009). Electrolux assumes that plaintiffs intended for the class period to run from March 5, 2004 to March 5, 2008, the date on which plaintiffs' original Complaint was filed. However, if plaintiffs intended to shift the class period with the filing of their Amended Complaint, all of the same – and some additional – problems with plaintiffs' class proposal would bar certification.

I.      **THE NAMED PLAINTIFFS**

A.      **Ms. Boyd**

Palecia Boyd, of Milledgeville, Georgia, alleges that she bought a Frigidaire washing machine (model number GLTF29040ES2) from retailer Union Furniture in Macon, Georgia on September 1, 2006.  (Am. Compl. ¶ 16.)  Plaintiffs do not allege that Ms. Boyd saw or heard representations made by Electrolux prior to buying the washer; nor do they claim that Ms. Boyd relied on any such representations.  Two years after her initial purchase – "[i]n or about July 2008" – Ms. Boyd alleges that she "began experiencing mold and mildew problems with her machine."  (*Id.*)  She does not allege that she notified Electrolux of her problem or that she gave Electrolux an opportunity to fix it.  Nor does she indicate whether she still uses the washer.

B.      **Mr. Terrill**

Michael Terrill lives in Cedarburg, Wisconsin.  (*Id.* ¶ 13.)  He allegedly bought a Frigidaire front load washer (model number GLTF2940ES0) from retailer Kennedy Hahn in Milwaukee, Wisconsin in April 2005.  (*Id.*)  The Amended Complaint does not include an allegation that Mr. Terrill saw or heard any representations made by Electrolux prior to buying the washer; nor does it include an allegation that Mr. Terrill relied on any such representations.

Over a year after the purchase – "[i]n mid-2006" – he alleges that he "began to notice odors in his laundry area and eventually discovered black streaks on garments and towels."  (*Id.*)  Mr. Terrill asserts that he "discovered mold and mildew deposits around the steel drum inside his machine, along with a noxious odor."  (*Id.*)  After his attempts to clean the washer failed, he allegedly contacted Frigidaire "[i]n or about January 2007," roughly six months after he first discovered the problem.  (*Id.*)  According to Mr. Terrill, he was advised "to wipe his machine after each use."  (*Id.*)  Plaintiffs have not indicated whether he followed this advice, whether the advice worked, or whether he continues to use his washer.

### C.   Ms. Pack

Denise Pack lives in Round O, South Carolina.  (*Id.* ¶ 17.)  She allegedly bought a Frigidaire washing machine (model number LTF2140ES3) from a Lowe's retailer in Summerville, South Carolina "[i]n or about July 2006."  (*Id.*)  Plaintiffs do not allege that Ms. Pack saw or heard any representations made by Electrolux prior to buying the washer or that she relied on any such representations.  According to Ms. Pack, "[i]n or about August 2006," she "began experiencing mold and mildew problems with her machine."  (*Id.*)  She does not allege that she notified Electrolux of her problem or that she gave Electrolux an opportunity to fix it. Nor does she indicate whether she still uses the washer.

### D.   Mr. Vogler

Michael Vogler lives in San Antonio, Texas.  (*Id.* ¶ 15.)  He alleges that he bought a Frigidaire washing machine (model number FTF2140ES3) from retailer Conn's in San Antonio "[i]n or about May 2007."  (*Id.*)  The Amended Complaint does not include an allegation that Mr. Vogler saw or heard any representations made by Electrolux prior to buying the washer; nor does it include an allegation that Mr. Vogler relied on any such representations.  Approximately eighteen months after his purchase – "[i]n or about November 2008" – Mr. Vogler allegedly "began experiencing severe allergies and noticed that his bellows had mold and mildew stains." (*Id.*)  Mr. Vogler asserts that at that time, "he contacted Frigidaire to complain about the mold and mild[ew] problems."  (*Id.*)  He alleges that because his warranty had expired, "Frigidaire would only agree to sell [him] a new boot."  (*Id.*)  Plaintiffs have not indicated whether Mr. Vogler bought the boot, or whether he still uses his washer.

### E.   Mr. Brown

Robert Brown lives in San Diego, California.  (*Id.* ¶ 14.)  He alleges that he bought a Frigidaire front load washer (model number LTF2140ES3) from a Lowe's retailer in San Diego

on May 8, 2006.  (*Id.*)  Plaintiffs do not allege that Mr. Brown saw or heard any representations made by Electrolux prior to buying the washer or that he relied on any such representations.

"In or about July 2006," Mr. Brown alleges that he "began to notice odor in his laundry area and eventually discovered black streaks on garments and towels."  (*Id.*)  Nearly three years after this alleged discovery, "[i]n or about May 2009," Mr. Brown contacted Electrolux "about the mold and mildew problems."  (*Id.*)  He alleges that Electrolux advised him by return e-mail "that to avoid mold, [he] would need to wipe the inside of his machine after every wash cycle and keep the washer door open when not in use."  (*Id.*)  Electrolux allegedly explained that if he could not "leave the door open, he should wipe the machine seal down with a wet wash cloth and then wipe it dry after every wash."  (*Id.*)  According to Mr. Brown, Electrolux also "offered to pay for the part and labor for a replacement bellows or . . . a rebate on the purchase of a comparable Frigidaire washer."  (*Id.*)

Plaintiffs have not indicated whether Mr. Brown followed Electrolux's advice or whether it worked to eliminate the alleged mold problem.  Nor does Mr. Brown disclose whether he allowed Electrolux to service his machine, or accepted the rebate offer on a comparable washer.  Indeed, plaintiffs have offered no evidence that Mr. Brown ever responded to Electrolux.  Nor have they stated whether Mr. Brown still uses his washer.

## II.    <u>FRONT LOAD WASHERS</u>

Front load washing machines differ substantially from traditional top-loading washers.  Traditional top-loading washers operate by filling the tub with water during the wash and rinse cycles and using a center agitator to move the clothes, which are completely submerged in the water.  By contrast, in front load washers, the tub is only partially filled and the clothes are then repeatedly spun through the water level by a tumbler.  Because they use substantially less water and energy than traditional washing machines, front load washers are also known as "high

efficiency" washers, and most are certified by the federal government's Energy Star program. *See, e.g.*, Soap & Detergent Association, *High Efficiency Washers and Detergents: Working in Harmony to Save Energy and Water* at 3 (2005), *available at* www.cleaning101.com/laundry/HE.pdf (high efficiency washers use from 20 percent to 66 percent of the water used by traditional washers, and as little as 20 percent to 50 percent of the energy used by traditional washers); Energy Star Program, United States Department of Energy, Innovation. Performance. Savings. Energy Star Makes It Simple! *2007 Partner Resource Guide* at 2, *available at* www.energystar.gov/ia/partners/manuf_res/salestraining_res/ ClothesWasher_PRG.pdf) ("An ENERGY STAR clothes washer can save over 7,000 gallons of water per year."). In addition, because front load washers clean clothes by tumbling them in water – rather than using a traditional agitator – the machines "offer very good washing, gentle action . . . and quiet operation." "Washer & Dryer Update," *Consumer Reports*, Feb. 2005 at 42 (attached as Ex. 1). For all of these reasons, *Consumer Reports* has advised its readers that "[f]or the best all-around performance, buy a front-loader." *Id.*

Without the complete flush that traditional top-loading washers receive from repeatedly filling the tub with water, front load washers can require periodic owner maintenance to prevent soil build-up and unpleasant odors. *See* Soap & Detergent Ass'n, *supra*, at 13-14 (recommending that owners periodically run a "maintenance cycle" using hot water and bleach). Mold and mildew require moisture and food (such as dirt or animal enzymes) to grow. (*See* Decl. of Michael C. Burns, Ph.D. ¶ 3, 4, 10) (attached as Ex. 2).) Hot water, bleach, and chlorine act to kill mold, mildew, and odor. (*See id.* ¶¶ 11-12.) Several actions, if taken by users, make it more likely that mold and mildew will form in their washing machines. These include: leaving wet clothes in the washer (*see id.* ¶ 9); using the "cold" or "warm" cycle most of the time (instead of "hot") (*see id.* ¶ 12); and placing the machine in a moist environment or one with

mold or mildew – such as a basement that has experienced water intrusion (*see id.* ¶ 8).  Other practices can reduce the formation of mold and mildew, including:  drying the interior of the machine (*see id.* ¶ 14); periodically cleaning the bellow of debris and accumulated residue from fabric softeners and detergents (*see id.*); and periodically running a "full" or "high" cycle with hot water and bleach, chlorine, or a washing machine cleaner (*see id.* ¶ 12).

Information regarding the potential for odors and mildew in front load washing machines was well publicized over the class period in newspapers and periodicals that would have been read by numerous putative class members before purchasing their washers.  For example, both the 2006 and 2007 *Consumer Reports Buying Guides* noted that "readers have reported that front-loading washers developed mold or a musty smell.  Leaving the door ajar between uses and using chlorine bleach occasionally should help."  *See Consumer Reports Buying Guide*, Washing Machines, at 80 (2006) (excerpt attached as Ex. 3); *Consumer Reports Buying Guide*, Washing Machines, at 77 (2007) (excerpt attached as Ex. 4).  In addition, the *Consumer Reports* monthly magazine (circulation: 4 million) published a number of articles during the proposed class period on the potential for odors in front load washers.  *See* "Washer & Dryer Update," *Consumer Reports*, at 42 (noting that readers have reported mold or smell that can be remedied by leaving the door open or occasional cleaning); "Washers & Dryers: Performance For Less," *Consumer Reports*, Feb. 2008, at 45 (attached as Ex. 5) ("Note that some users of front-loading washers have experienced mold or mildew problems from water remaining in the door seal.  Check the manual for guidance, or leave the door open for an hour or so after every wash session.").

Other publications provided similar information to consumers.  For example, in January 2008, *The Seattle Post-Intelligencer* reported that "the same technology that makes high-efficiency washers more eco-friendly can turn them into breeding grounds for mold and mildew," especially when consumers "use more detergent than they really need," causing

detergent and dirt build-up.  *See* Sheba R. Wheeler, "Your Washer Can Need Cleaning Tablets [*sic*] Result In A Sweet-Smelling Machine," *The Seattle Post-Intelligencer*, Jan 12, 2008, at C3 (attached as Ex. 6).  As a result, consumers were advised to use "a monthly maintenance and cleaning routine to purge and prevent washing machine funk."  *Id.*; *see also* Jane Greig, "Consumer Q&A," *Cox News Service*, Jul. 24, 2006 (attached as Ex. 7) (noting that odors in front load washing machines can be avoided by using only "high efficiency" detergent, "leav[ing] the door ajar to let the washer dry between washes," and "clean[ing] the door seals regularly with a solution of bleach and water"); Glenn Haege, "Professional Waxes Help Wood Floors," *The Detroit News*, Nov. 28, 2007, at 3E (attached as Ex. 8) (informing readers of "recent problems . . . with the new, European design washers which use very little water and a very fast spin-dry cycle" and noting that "[i]t seems to help to keep the front door open when not in use" or use a washing machine cleaner).

In fact, the potential for odor in front load washing machines was sufficiently well-known by 2007 that a former appliance repairman named Paul Flynn invented a product called "SmellyWasher," designed to clean front load washers.  *See* Glenn Haege, "Get Rid of Stinky Fungus in That Front-Loading Washer," *The Detroit News*, June 9, 2007, at 14H (attached as Ex. 9) (noting that Flynn developed a "completely nontoxic and environmentally safe" solution to clean front load washers; "all it takes is adding 1 tablespoon to your washer . . . and filling it to the highest and hottest setting"); Jean Patterson, "Clean Out Washer For Fresh Towels," *Daily Press* (Newport News, Va.), Aug. 16, 2007, at D2 (attached as Ex. 10) (suggesting that a reader treat his washer monthly with SmellyWasher – a "nontoxic product formulated to rid washers of fungus without harming the machine, drains or septic tanks" – to prevent odors).

III.    **ELECTROLUX'S CUSTOMER SERVICE EXPERIENCES WITH THE SUBJECT WASHING MACHINES**

Because the water level in front load washers reaches above the door, the door has a rubber boot (otherwise known as a "bellow") that helps maintain a watertight seal, prevents clothing from slipping into the space between the outer tub and the wash basket, and serves as a mounting point for other washing machine components without contributing to machine vibration. (Decl. of Chris Hill (" Hill Decl.") ¶ 8 (attached as Ex. 11).) A boot/bellow is unnecessary for traditional top-loading washers because the water level does not reach the top of the machine. During plaintiffs' proposed class period (March 2004 to March 2008), Frigidaire front load washers were equipped with one of two types of bellow: a bellow with convolutions or an "S" shaped bellow. (*Id.* ¶ 9.) Plaintiffs assert that Electrolux admitted in a "Service Flash" announcement in April 2007 that there was a problem with the convoluted bellow included on some front load washing machines. (*See, e.g.*, Pls.' Mot. at 3 (citing Frigidaire Service Flash LN073 ("Service Flash") (attached to Tamblyn Decl. In Supp. Of Pls.' Mot. as Ex. A).) That Service Flash states that certain front load washers can experience a problem with water collection in the boot/bellow. According to the Service Flash, "[w]hen the door is opened at the end of the cycle, a small amount of water is noticed in the convolutions of the boot at the six o'clock position." (*See* Service Flash.) The Service Flash goes on to explain that "water standing at the bottom of the washer boot after completion of a wash cycle is normal," and that "the likelihood of a biofilm formation is reduced by the vent system in the new washers." (*Id.*) However, because "customers may still have a perceived concern," the Service Flash notes that "[a] new boot style that does not have convolutions is now available." (*Id.*)

Of the approximately 1.3 million front load Frigidaire washers sold between March 2004 and March 2008, only about 585,000 included the convoluted boot/bellow that plaintiffs claim is

defective.  (Hill Decl. ¶ 9.)  This is because, in 2006, Electrolux began introducing a new "S" shaped boot design on certain Frigidaire models, which was subsequently phased into other models.  (*Id.*)  The "S" shaped bellow does not have convolutions in which water can become trapped.  Although Electrolux could use dates of manufacture to determine the bellow type for some machines, the only practical means to determine which bellow many washers used would be to physically investigate the particular machine.  (*Id.*)

Each of the washing machines at issue came with – at least – two warranties:  (1) a "Full One-Year Warranty (From Date of Purchase)," stating that Frigidaire will pay for "[l]abor and replacement [of] parts which prove to be defective in materials or workmanship;" and (2) a "Limited 2nd - 25th Year Warranty (From Date of Purchase)," stating that Frigidaire will pay for a "Replacement part for an inner wash basket that breaks due to a defect in materials or workmanship."  (Frigidaire Tumble Action Washer Warranty (attached as Ex. 12); Electrolux Major Appliance Warranty Information (attached as Ex. 13).)

If a problem arises during the warranty period, a customer can call Electrolux to seek assistance.  Those consumers who did contact Electrolux had different comments and concerns regarding their front load washers.  Some customers contacted the company because they had heard reports that front load washing machines had issues with mold but made clear that they had not experienced any problems themselves.  (*See, e.g.*, Electrolux 1572-73.)[3]  And while some customers told the company that they had concerns regarding odors from possible mold and mildew build-up from normal use of their machines (*see, e.g.*, Electrolux 1924-25), others only noticed a problem with their washing machines in specialized usage conditions – for example when they did not run the machines regularly (*see, e.g.*, Electrolux 1816-17; Electrolux 4441-42

---

[3]    All documents designated with "Electrolux" identification numbers are attached collectively, in numerical order, as Exhibit 14.

(customer experienced problems after starting washing machine that had been out of use for five years)).  Still other consumers owned multiple washers and only experienced odor issues with regard to one of them.  (*See, e.g.*, Electrolux 2402-03.)  Others had complaints about the build-up of detergent and dirt in the bellow – not mold or mildew.  (*See, e.g.*, Electrolux 4336-37.)  And still other consumers experienced odor issues that were not related to the washing machine at all.  (*See, e.g.*, Electrolux 3733-34 (contractor who serviced the unit noted that the customer "is on well water and the smell is coming from the sulphur in the well water . . . there is nothing wrong with the washer"); Electrolux 2299-2300 (moldy smell in machine went away when machine was removed from garage, and therefore smell was likely coming from the garage, not the machine).)

When consumers contacted Electrolux expressing concerns about mold, mildew, or odor in connection with the use of front load washers, Electrolux sought to provide advice regarding how to fix the problem – and prevent it from reoccurring – through basic owner maintenance (such as periodically running a "full" or "high" cycle with hot water and bleach, chlorine, or a washing machine cleaner, drying out the inside of the machine after use, and avoiding the use of detergents or fabric softeners with animal fats).  (*See, e.g.*, Hill Decl. ¶¶ 10-12.)  Some customers reported that they were very satisfied after Company representatives explained to them how to correct the problem.  (*See, e.g.*, Electrolux 1879-81.)  Indeed, the majority of consumers who received information from Electrolux regarding owner maintenance never contacted the company again with complaints about odor, mold or mildew.  (*See* Hill Decl. ¶ 13.)  By contrast other customers complained that the methods they had used to attempt to fix the odor problem were ineffective.  (*See, e.g.*, Electrolux 1928-1929.)  Still other customers simply refused to take any of the suggested corrective steps to address the issue (*see, e.g.*, Electrolux 2008-09) or stated

that they did not think they should be required to perform owner maintenance (*see, e.g.*, Electrolux 2123-24).

If a customer was not satisfied with the advice he or she received from the Company, Electrolux would often request that a service visit be scheduled.  (Hill Decl. ¶ 14.)  Electrolux works with various independent contractors to service appliances during the warranty period. Only 1,106 (0.083 percent) of the front load washers sold during the class period had such a service call from a technician related to odor, mold, or mildew.  (Decl. of David Fuller ("Fuller Decl.") ¶ 11 (attached as Ex. 15).)  That means ***99.917 percent of such washers sold in the U.S. had no warranty service call related to odor, mold, or mildew*.**[4]  (*Id.*)  In addition, between March 2004 and March 2008, service technicians made approximately 75 visits to address mold, mildew or odor issues in machines that were no longer within the warranty period, at no cost to the owner.  (*Id.* ¶ 9.)  In some cases, service technicians who made visits to address alleged mold or odor issues were unable to detect any problem.  (Hill Decl. ¶ 14.)  In other cases, service technicians were asked to address mold, mildew or odor issues that did not involve the bellow. (*Id.*)  In still other cases, service technicians replaced the bellow on the machine.  (*See, e.g.*, Tamblyn Decl. Ex. K (Electrolux 001077-81).)  In addition, some customers were given rebates – in varying amounts – toward the purchase of a new washing machine, while others were given an extension on the manufacturer's warranty applicable to their washing machines to ensure that potential reoccurrences of mold or odor would be covered.  (Hill Decl. ¶¶ 15, 17.)

## ARGUMENT

Class certification "is not automatic."  *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 271 (N.D. Ala. 2009).  Rather, "the court must perform a 'rigorous analysis'" to determine

---

[4]      This percentage is, in fact, understated because 33 units had multiple service visits that are included in the 1,106 number.  (*Id.* ¶ 21.)

whether the requirements of Rule 23 are satisfied. *Id.* (citation omitted). This requires a court to "'examine the cause[s] of action asserted in the complaint on behalf of the putative class'" and determine whether they can be resolved as to all plaintiffs in a single trial. *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000) (citation omitted); *see also In re HealthSouth*, 257 F.R.D. at 270 (the court "must conduct a searching inquiry, including a possible 'probe behind the pleadings before coming to rest on the certification question'") (quoting *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). If there is any doubt as to whether the Rule 23 requirements have been met, certification should be denied. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008) (a court should not grant "certification in the face of doubt as to whether a Rule 23 requirement has been met").

Plaintiffs here cannot establish many of Rule 23's requirements for class certification. First, plaintiffs' proposed class definition is impermissibly overbroad in that it includes ***all*** washing machine purchasers regardless of whether they have experienced a problem with their machines. Second, plaintiffs' proposed nationwide class fails both the predominance and superiority requirements of Rule 23(b)(3) because it implicates widely varying state laws. Third, plaintiffs' alternative state-wide classes are similarly ill-suited for class certification because plaintiffs' claims turn on highly individualized factual inquiries that cannot be undertaken on a classwide basis. And fourth, plaintiffs cannot satisfy the typicality and adequacy requirements with respect to their warranty-based claims because their claims are subject to unique defenses. For all of these reasons, plaintiffs cannot satisfy their burden of showing that Rule 23's requirements are satisfied, and their motion must be denied.

## I.   PLAINTIFFS' PROPOSED CLASS DEFINITION IS IMPERMISSIBLY OVERBROAD.

As a threshold matter, plaintiffs' motion should be denied because their proposed class includes numerous washing machine purchasers who have never experienced any problems with their machines or sought warranty service from Electrolux – and is thus overbroad.

The law is well established that a proposed class that includes all users of a product – regardless of whether they have any complaint about the product – is not "sufficiently definite" to allow class certification.  *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see also Chatham v. Sears, Roebuck & Co., In re Sears, Roebuck & Co. Mktg. & Sales Practices Litig.*, No. MDL 1703, 2007 U.S. Dist. LEXIS 89349, at *3-4, *12-16 (N.D. Ill. Dec. 4, 2007) (denying certification of a proposed class of Craftsman tool purchasers alleging that Sears inaccurately advertised tools as being "Made in USA" because the proposed class included people who neither saw the advertisements at issue nor cared whether the tools were made in this country); *Almonor v. Bankatlantic Bancorp, Inc.*, No. 07-61862-CIV, 2009 U.S. Dist. LEXIS 67598, at *11-12 (S.D. Fla. July 28, 2009) (class definition that encompassed individuals who could not have suffered any harm from defendant's conduct was "overly broad" and "unworkable"); *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 327-28, 334 (S.D. Ill. 2009) (denying certification of warranty claims because the proposed class definition included product owners who never made a warranty claim during the warranty period, much less had a claim denied, and therefore had not suffered any injury).

In *Oshana*, the U.S. Court of Appeals for the Seventh Circuit upheld the district court's refusal to certify a proposed class of Illinois residents alleging statutory consumer fraud and unjust enrichment claims based on their purchase of fountain Diet Coke.  There, the named plaintiff claimed that Coca-Cola "tricked consumers into believing that fountain Diet Coke" did

not contain the artificial sweetener saccharin and sought to certify a class of all individuals statewide who had purchased the fountain soda.  472 F.3d at 509.  The court found that the class was not "sufficiently definite to warrant class certification."  *Id*. at 513.  According to the court, while plaintiff's claims required some proof that the proposed class members were deceived and injured by Coca-Cola's alleged misrepresentation, "[m]embership in [the] proposed class required only the purchase of a fountain Diet Coke."  *Id*. at 514.  Thus, the proposed class "could include millions [of consumers] who were not deceived and thus have no grievance."  *Id*.  According to the court, because "[c]ountless members of [the] putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception," the class was overbroad and could not properly be certified.  *Id*.

Similarly, in *Hovsepian v. Apple, Inc.*, No. 08-5788, 2009 U.S. Dist. LEXIS 117562, at *18-19 (N.D. Cal. Dec. 17, 2009), the named plaintiff asserted consumer protection and other claims based on the allegation that the screens on iMAC computers contained a defect that caused them to fail prematurely.  The court struck the class claims on the ground that the proposed class – which encompassed all iMAC purchasers – included "members who have not experienced any problems with their iMAC display screens" and therefore "have no injury and no standing to sue."  *Id*. at *18.  As a result, the court concluded that the proposed class definition was impermissibly overbroad.  *See id*. at *19.

Plaintiffs' class definition here suffers from the very same problem.  As set forth above, plaintiffs' proposed class includes ***all*** individuals who have purchased a number of models of front load washing machines over the last four years.  But less than half of the machines sold during the class period (about 585,000 out of 1.3 million) included the convoluted boots that plaintiffs allege cause mold and mildew problems.  (Hill Decl. ¶ 9; Pls.' Mot. at 3-4.)  Thus,

most of the proposed class members purchased products that did not even contain the component plaintiffs claim is defective.

Moreover, the overwhelming majority of the proposed class members who **did** purchase machines with the convoluted boot at issue have never complained about a problem with their washing machines. As set forth above, less than one-tenth of one percent of the putative class members required a visit by a service technician to address alleged problems relating to odor, mold or mildew during the warranty period. (Fuller Decl. ¶ 11.) Even if all those service calls had involved front load washing machines with convoluted bellows (which, as noted above, the company could not practically determine without inspections), they would still account for far less than one percent of the allegedly defective washers. Thus, just like the classes rejected in *Oshana*, *Chatham* and *Hovsepian*, the proposed class here necessarily includes a large number of individuals who cannot prevail on their claims as a matter of law. For this reason alone, the proposed class should be rejected.

## II.   PLAINTIFFS' NATIONWIDE CLASS PROPOSAL FAILS THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS FOR CLASS CERTIFICATION.

Even if plaintiffs had not proposed an overbroad class, their proposed nationwide class would fail the predominance and superiority requirements of Rule 23(b)(3). The law is well settled in this and other circuits that the need to apply numerous states' laws defeats certification of a nationwide class. *See Andrews v. AT&T*, 95 F.3d 1014, 1024 (11th Cir. 1996) (reversing class certification of nationwide class alleging violations of state statutes; "the need to interpret and apply the . . . laws of all fifty states to assess the legality of" defendants' conduct is "foremost among the difficulties in trying the" plaintiffs' claims on a class basis); *Bishop's Prop. & Invs., LLC v. Protective Life Ins. Co.*, 255 F.R.D. 619, 624 (M.D. Ga. 2009) ("'class certification is impossible where the fifty states truly establish a large number of different legal

16

standards'") (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1261 (11th Cir. 2004)).  This is so because, in a multi-state class action involving the varying laws of numerous jurisdictions, "the district judge would face an impossible task of instructing a jury on the relevant law" that applies in each state.  *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996).

As explained below, Georgia's choice-of-law rules require that each proposed class member's claims be governed by the law of his or her home state.  Thus, the widely varying laws of all 50 states would apply to plaintiffs' claims, making a single class trial unmanageable.

A.      **Under Georgia's Choice-Of-Law Rules, The Law Of Each Putative Class Member's Home State Governs His Or Her Claims.**

It is axiomatic that "[a] federal court sitting in diversity, as in this case, must apply the choice of law principles of the state in which it sits."  *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone*, 572 F.3d 893, 894 n.1 (11th Cir. 2009).  Plaintiffs argue that Georgia's choice-of-law regime has an unusual characteristic in that it presumptively applies Georgia law to non-statutory claims.  (*See* Pls.' Mot. at 11.)  Accordingly, plaintiffs assert, each of the proposed class members' claims can be decided under Georgia law.  Plaintiffs are wrong for two reasons:  (1) their consumer fraud and warranty claims *do* implicate other states' statutes; and (2) applying Georgia law to their unjust enrichment claims would not be proper because Georgia does not have a relationship to plaintiffs' allegations.

1.      **Plaintiffs' Consumer Fraud And Warranty Claims Are Statutory In Nature.**

*First*, plaintiffs' theorized presumption – even if it exists – would not apply to plaintiffs' consumer fraud and breach of warranty claims because they are statutory in nature.  Moreover, a proper choice-of-law analysis makes it clear that these claims are governed by the law of each proposed class member's home state.

Under Georgia law – and the law of the other states in which the named plaintiffs reside – claims for breach of warranty arise under, and are governed by, code, not common law. *See, e.g.*, Ga. Code Ann. § 11-2-101 *et seq.* (express and implied warranty); Cal. Com. Code § 2101 *et seq.* (express and implied warranty); S.C. Code Ann. § 36-2-101 *et seq.* (express and implied warranty); Tex. Bus. & Com. Code § 2.101 *et seq.* (express and implied warranty); Wis. Stat. Ann. § 402.101 *et seq.* (express and implied warranty). For this reason, courts have rejected the argument (made again here) that Georgia law should be presumed to apply to claims for breach of warranty involving non-Georgia sales. *See, e.g.*, *Monticello v. Winnebago Indus., Inc.*, 369 F. Supp. 2d 1350, 1356 (N.D. Ga. 2005); *Bailey v. Monaco Coach Corp.*, 350 F. Supp. 2d 1036, 1042 (N.D. Ga. 2004), *aff'd*, 168 F. App'x (11th Cir. 2006); *Gilbert v. Monaco Coach Corp.*, 352 F. Supp. 2d 1323, 1329 (N.D. Ga. 2004). As these courts have recognized, the proper approach is to apply the "*lex loci contractus*" rule, under which the law of the place of contract applies. *See Gilbert*, 352 F. Supp. 2d at 1329 (Arizona law applied to plaintiff's warranty-based claims because plaintiff negotiated and executed the sales contract and warranty for vehicle in Arizona and took possession there). In actions – like this one – arising from the purchase of a product, this rule points to the law of the state where the purchase was made. *See id.*; *Bailey*, 350 F. Supp. 2d at 1042 (applying Florida law to warranty claims where plaintiff "negotiated and executed the sales contract, which included the Limited Warranty, in Florida").

The same is true with regard to plaintiffs' statutory consumer protection claims. Georgia has adopted the *lex loci delicti* approach to choice of law for tort cases – that means that the law of the place where the plaintiff claims he or she was injured applies to his or her tort claims. *See Luigino's Int'l, Inc. v. Miller*, 311 F. App'x 289, 292 (11th Cir. 2009) ("Under Georgia's choice of law doctrine of *lex loci delictis*, the law of the state where the injury occurred governs [a] fraud action.") (citing *IBM Corp. v. Kemp*, 244 Ga. App. 638, 640 (2000)); *see also Risdon*

*Enters., Inc. v. Colemill Enters., Inc.*, 172 Ga. App. 902, 904 (1984) ("[T]he *locus delicti* . . . is the place where the injury sustained was suffered rather than the place where the act was committed, or, as it is sometimes more generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place.") (citation omitted).  Here, plaintiffs allege that they were defrauded at the time they purchased their washing machines. Thus, plaintiffs' consumer fraud claims – like their warranty-based claims – are governed by the law of the state where they purchased the machines (which is also presumably the state where they reside and use the washers).

Plaintiffs contend that a choice-of-law analysis is not necessary because they have not explicitly "reference[d] foreign state statutes" with regard to their warranty claims and the statutory consumer protection claims.  (Pls.' Mot. at 11, 13.)  But that too is incorrect.  In their Amended Complaint, plaintiffs affirmatively allege claims under California's Unfair Competition Law (Am. Compl. Count VI), the Texas Deceptive Trade Practices Act (*id*. Count VII), and the Wisconsin Deceptive Trade Practices Act (*id*. Count VIII) on behalf of their alternative statewide classes.  Thus, plaintiffs have essentially admitted that the proposed class members' consumer protection allegations are governed by the statutory law of their home states. In any event, plaintiffs have not – and cannot – point to any Georgia law suggesting that plaintiffs can avoid a choice-of-law analysis with regard to their warranty or consumer fraud claims simply by failing to reference the relevant code provisions underlying those claims in their complaint.  That would invite a manipulation of choice-of-law standards.  For this reason too, there is no basis for plaintiffs' suggestion that Georgia law can be applied uniformly to the statutory consumer protection or warranty claims of all proposed class members nationwide.

### 2.   Georgia Law Cannot Be Universally Applied To Plaintiffs' Unjust Enrichment Claims.

*Second*, courts disagree as to whether Georgia choice-of-law rules require the application of Georgia law to common law claims such as unjust enrichment.  While plaintiffs are able to point to a few federal court rulings that support their position (*see* Pls.' Mot. at 11), many Georgia state courts (and other federal courts) have taken a different approach – holding that tort-based claims are subject to the state's *lex loci delicti* test even if they arise under the common law.  *See Kemp*, 244 Ga. App. at 641 (evaluating proposed class members' fraud claims under the *lex loci delicti* test and determining that the law of proposed class members' home states applied to both causes of action); *Luigino's Int'l*, 311 F. App'x at 292 (Florida law applied to plaintiffs' common law fraud claim because "[u]nder Georgia's choice of law doctrine of *lex loci delictis*, the law of the state where the injury occurred governs the fraud action"); *Asplundh Tree Expert Co. v. Emeritis LLC*, No. 1:06-cv-432, 2006 U.S. Dist. LEXIS 45581, at *10-11, *15 (N.D. Ga. June 27, 2006) (Pennsylvania law applied to common law tort claims for negligent misrepresentation and fraud where alleged losses occurred in that state); *Poe v. Sears, Roebuck & Co.*, No. CivA1:96-CV-358, 1998 WL 113561, at *3 (N.D. Ga. Feb. 13, 1998) (denying nationwide class certification of plaintiffs' common law fraud, negligent misrepresentation and breach of contract claims because the relevant choice-of-law tests required application of varying state laws); *Mgmt. Science Am., Inc. v. NCR Corp.*, 765 F. Supp. 738, 740-41 (N.D. Ga. 1991) (because plaintiff's economic losses occurred in Ohio, "Georgia's conflict of law rules clearly mandate the application of Ohio law to NCR's fraud claims").

Moreover, even if there were a consensus among courts that Georgia law would presumptively govern common law unjust enrichment claims, that presumption is overcome by the fact that Georgia does not have a "significant relation[ship]" to plaintiffs' allegations.

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 n.6 (11th Cir. 1987) ("[E]ven if Georgia law would require application of its own common law rules to some claims involving purchases in other states, the law of Georgia could be applied consistent with due process only if the particular transaction had some significant relation to Georgia."); *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 678 (N.D. Ga. 2003) (same); *Brenner v. Future Graphics, LLC*, 258 F.R.D. 561, 571 (N.D. Ga. 2007) (same).  Here, each plaintiff purchased and used his or her washing machine in his or her home state.  And other than plaintiff Boyd, who is a Georgia resident, not one of the plaintiffs has alleged any contacts with the state.  Moreover, while plaintiffs claim that the washing machines at issue were designed and manufactured in Georgia (Pls.' Mot. at 12), that is not true.  As set forth in the Declaration of Chris Hill, all product design decisions for the washing machines at issue, including decisions with respect to the convoluted bellow and the subsequent "S" shaped bellow, were based at the Company's plant in Webster City, Iowa or otherwise outside of the state of Georgia.  (Hill Decl. ¶¶ 4-8.)  The Testing & Evaluation Group, Consumer Science Group, Technical Information Department and Reliability Laboratory for the machines were also located at the Webster City, Iowa facility.  (*Id.* ¶¶ 4-5, 7.)  And the majority of the work performed on front load washers by the Feasibility Laboratory was done in Webster City and outside of Georgia.[5]  (*Id.* ¶ 4.)  In addition, all of the washing machines were manufactured in Iowa and shipped to retailers or regional distribution centers from Iowa. (*Id.* ¶ 6.)  Finally, the materials Electrolux provided to consumers and service professionals regarding its front load washing machines – including user manuals, use and care guides and the

---

[5]      The Testing and Evaluation Group conducts in-house bench testing of washing machine component parts early on in the development process, and also performs some of the testing required by independent organizations, such as Underwriters Laboratories.  The Consumer Science Group is responsible for wash performance testing, as well as some of the testing required by independent organizations, such as Consumer Reports and the Association of Home Appliance Manufacturers.  The Feasibility Laboratory tests washers for reliability while some components may still be in the prototype phase.  The Reliability Laboratory tests washers for reliability later on in the development process, simulating real-world use by consumers.  (*Id.* ¶ 5.)

specific Service Flash cited by plaintiffs – were drafted primarily by Webster City personnel. (*Id.* ¶¶ 6-7.)

For these reasons, plaintiffs' argument that "due process" principles "require[] the application of Georgia law" to all of their claims because Electrolux has corporate offices in the State (Pls.' Mot. at 11) is precisely backwards.  Courts have consistently rejected the notion that the law of the place of a "manufacturer's residence" governs product liability claims because such an approach runs counter to consumers' legitimate expectations and ignores the superior interests of the states where the buyers live, shop and use their products.  *See, e.g.*, *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1016-18 (7th Cir. 2002) (rejecting application of the law of the manufacturer's residence to the claims of a nationwide class, terming plaintiffs' approach "a novelty"); *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 921 (Ill. 2007) ("California has no interest in extending its laws to noncitizens and to actions that occurred outside of [its] borders."); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 855 (Ill. 2005) (similar, Illinois); *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 681 (Tex. 2004) (similar, Texas).  Clearly, a consumer who buys a washing machine in Idaho from an Idaho retailer and experiences a problem with it in Idaho justifiably expects Idaho law to govern her claim, regardless of where the manufacturer has its corporate offices.  For these reasons, the Supreme Court has explicitly rejected the presumption that the law of the forum (or the defendant's home state) automatically controls where, as here, plaintiffs have no connection to that state.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985).  Thus, the mere fact that Electrolux has offices in Georgia is not sufficient to require the application of Georgia law to all plaintiffs' claims.  *See In re ConAgra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 695 (N.D. Ga. 2008) (rejecting argument that Georgia law could be universally applied to unjust enrichment and other claims on behalf of nationwide class; a state does not

"pass[] the 'significant contacts' test" in a product liability action simply because "the manufacturer . . . is headquartered" there).  Moreover, a presumption that Georgia law applies would be especially inappropriate here because the development and manufacturing of the washing machines at issue took place in Webster City, Iowa – not Georgia.  (*See* Fuller Decl. ¶ 5; Hill Decl. ¶¶ 4-8.)  Thus, Georgia has no real connection to – or interest in – the resolution of plaintiffs' claims.

In sum, the proposed class members likely bought their washers, used their washers and experienced any alleged defect in their washers within their home states.  Accordingly, under Georgia choice-of-law principles and constitutional due process principles, each proposed class member's claims should be governed by his or her own state's laws.

### B.   The Need To Apply Multiple States' Laws Defeats Both Predominance And Superiority.

As noted above, the law is well settled that multi-state and nationwide class actions cannot be certified where – as here – "differing standards . . . required by the laws of the various states would render class action treatment unmanageable."  *Kirkpatrick*, 827 F.2d at 725; *see also Andrews*, 95 F.3d at 1024 (affirming trial court's refusal to certify nationwide class; "[s]crutinizing . . . [the transactions] under the provisions of fifty jurisdictions complicates matters exponentially"); *Poe*, 1998 WL 113561, at *3 (denying certification of nationwide fraud and contract class because the varying substantive law of each plaintiff's home state would govern); *Bishop's Property*, 255 F.R.D. at 624 ("'In a multi-state class action, variations in state law may swamp any common issues and defeat predominance.'") (citation omitted); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi state class action, variations in state law may swamp any common issues and defeat predominance."); *In re Am. Med. Sys.*, 75 F.3d at 1085 ("If more than a few of the laws of the fifty states differ, the district judge would

face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action.").

Plaintiffs try to argue that this case is different – that application of multiple states' laws should not defeat class certification because the laws of the five states in which the named plaintiffs live are purportedly similar with respect to all of their causes of action.  (Pls.' Mot. at 19-23.)  Again, plaintiffs are wrong.  As an initial matter, because plaintiffs propose a nationwide class, plaintiffs have the burden of establishing that the laws of **all 50 states** are sufficiently uniform to make a class trial feasible.  *See Sanders v. Johnson & Johnson, Inc.*, No. 03-2663, 2006 U.S. Dist. LEXIS 35881, at *11 (D.N.J. May 31, 2006) (plaintiff seeking certification of a nationwide class "has the burden to 'creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles'") (citations omitted); *Cole v. GMC*, 484 F.3d 717, 724 (5th Cir. 2007) (similar).  Plaintiffs' cursory discussion of the laws of only five states does not come close to meeting their burden to conduct an "extensive analysis" of state law.[6]  Moreover, even if it were proper to look at only five states' laws (and, of course, it is not), the laws governing plaintiffs' claims for breach of warranty, consumer protection and unjust enrichment vary in so many relevant ways that a class trial would be utterly unmanageable.  (*See* Appendix A:  Outline of State-Law Variations.)

**Statutory Consumer Fraud.**  As set forth in Appendix A, consumer fraud law varies among the five states where plaintiffs reside (and the other 45 states as well) in a number of

---

[6]      Plaintiffs have also failed to propose a workable plan for a nationwide class action trial.  As the U.S. Court of Appeals for the Eleventh Circuit has recognized, a "plaintiff seeking class certification bears the burden of establishing each element of Rule 23," including superiority, "and courts must consider how a case will be tried as part of the superiority assessment."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 n.20 (11th Cir. 2009).  Accordingly, the Eleventh Circuit has recommended that class certification plaintiffs be required to "present feasible trial plans, which should include proposed jury instructions," to demonstrate that the proposed class members' claims can feasibly be tried together.  *Id.*; *see also Sweet v. Pfizer*, 232 F.R.D. 360, 370 (C.D. Cal. 2005) ("[P]laintiffs seeking certification of a nationwide class in which numerous state laws may apply bear the burden of demonstrating a trial plan.").

respects, including: (1) whether plaintiffs can seek damages or only injunctive relief; (2) whether plaintiffs and absent class members must prove causation and/or reliance; (3) whether plaintiffs must show that the defendant acted "knowingly" or with some other degree of intent; and (4) whether plaintiffs must prove that the defendant's conduct affected a public interest. (*See* Appendix A, pp. 1-11.) Because of these and other variations, courts have consistently refused to certify multi-state and nationwide consumer fraud classes. *See, e.g., In re Bridgestone/Firestone*, 288 F.3d at 1015-19 (decertifying two nationwide classes and recognizing considerable variations among state consumer protection laws); *Castano*, 84 F.3d at 743 (reversing certification of nationwide class where plaintiff failed to explain "how the court could deal with variations in state law," including statutory consumer fraud laws); *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D. Fla. 2002) (denying nationwide certification of consumer fraud class in part because of "several material conflicts between [Florida's Deceptive and Unfair Trade Practices Act] and other states' consumer fraud acts").

***Breach Of Express And Implied Warranty.*** "'The Uniform Commercial Code is not uniform.'" *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C. Cir. 1986) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 3 (2d ed. 1980)). As set forth in Appendix A, warranty laws vary among the plaintiffs' home states, and across the country, with regard to: (1) whether plaintiffs must demonstrate privity to prevail on warranty claims; (2) what standards govern the meaning of "merchantability" for implied warranty claims; (3) whether actual reliance is required for express warranty claims; (4) what types of statements qualify as express warranties; (5) notice requirements for warranty-related claims; and (6) the availability and applicability of affirmative defenses. (*See* Appendix A, pp. 12-19.) Because of these and other variations, courts have routinely refused to certify multi-state and nationwide class actions involving claims for breach of warranty. *See, e.g., Cole*, 484 F.3d at 724-30 (reversing

25

nationwide certification of warranty class where plaintiffs "glossed over the glaring substantive legal conflicts among the applicable [warranty] laws of each jurisdiction"); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 at 1015 ("[S]tate laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty . . . suits may not proceed as nationwide classes."); *Spence v. Glock*, 227 F.3d 308, 313 (5th Cir. 2000) (reversing nationwide class certification where plaintiffs failed to compare states' laws governing warranty and other claims; "Plaintiffs' failure to carry their burden, and the district court's unwillingness to hold plaintiffs to their proof, have resulted in a critical legal deficiency – insufficient evidence of predominant common legal issues"); *Danielson v. DBM, Inc.*, No. 1:05-cv-2091-WSD, 2007 U.S. Dist. LEXIS 18609, at *13-14 (N.D. Ga. Mar. 15, 2007) (denying certification of implied warranty claims because of variations among state laws); *McBride v. Galaxy Carpet Mills, Inc.*, 920 F. Supp. 1278, 1286 (N.D. Ga. 1995) (denying nationwide class certification in warranty case because "the difficulty in applying the law applicable to each plaintiff's claims would make a nationwide class action unmanageable"); *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 321 (S.D. Ill. 2007) ("*Dex-Cool*") ("Plaintiffs' briefing on class certification largely ignores the significant variations in the law governing express warranties among the forty-seven states in the proposed class.").[7]

---

[7]    The variations in plaintiffs' state law warranty claims also doom certification of their federal Magnuson-Moss Warranty Act ("MMWA") claims.  To prevail on a claim under the MMWA, plaintiffs must first prove a violation of the applicable state warranty law.  *See Hines v. Mercedes-Benz USA, LLC*, 358 F. Supp. 2d 1222, 1235 (N.D. Ga. 2005) (to recover under the MMWA, plaintiffs "must show that Defendant breached written and implie[d] warranties ***arising under [state] law***") (emphasis added) (citing 15 U.S.C. § 2310(d)(2)).  Thus, variations in state warranty law make nationwide certification of MMWA claims inappropriate as well.  *See, e.g., Kaczmarek v. IBM Corp.*, 186 F.R.D. 307, 312-13 (S.D.N.Y. 1999) (denying nationwide class certification of MMWA claims in light of legal variations; "bringing the case under the Magnuson-Moss Act does not make uniform the plaintiffs' warranty claims because liability under that Act depends on state law which differs on issues of express and implied warranties"); *Dex-Cool*, 241 F.R.D. at 324 (denying certification of nationwide Magnuson-Moss warranty class because of material variations in applicable state warranty laws); *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 271-72, 276 (D.D.C. 1990) (denying certification of nationwide class of car purchasers asserting MMWA claims due to variations in applicable states' warranty laws).

*Unjust Enrichment*.  The "'definition of unjust enrichment'" and the requirements for stating an unjust enrichment claim "'var[y] from state to state.'"  *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 563 (E.D. Ark. 2005) (citation omitted).  As set forth in more detail in Appendix A, unjust enrichment laws vary with regard to:  (1) whether the existence of an express contract between the parties precludes an action for unjust enrichment; (2) the definition of the term "unjust"; (3) the substantive elements plaintiffs must prove to prevail on an unjust enrichment claim; and (4) whether the plaintiffs must establish that a defendant knew or had awareness of the benefit giving rise to the unjust enrichment claim.  (*See* Appendix A, pp. 20-27.)  In light of these variations, court after court has refused to certify multi-state class actions involving unjust enrichment claims.  *See, e.g., In re ConAgra Peanut Butter*, 251 F.R.D. at 697-98 (denying nationwide certification of unjust enrichment class; "[p]laintiffs have failed to carry their burden that there are no material variations in state [unjust enrichment] law"); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999) (denying certification of multi-state class because a number of "variances exist in state common laws of unjust enrichment" and therefore, "the claim of unjust enrichment is packed with individual issues and would be unmanageable"); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 214 (D. Minn. 2003) (denying nationwide certification in part because plaintiffs provided insufficient information for the court to conclude that the laws concerning unjust enrichment "are not significantly or materially different"); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 1703, 2007 WL 4287511, at *9 n.7 (N.D. Ill. Dec. 4, 2007) ("It is clear just from our review of Illinois law that unjust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone amongst the fifty states.").

In short, each state has adopted different elements, standards of proof and applicable defenses with regard to each of plaintiffs' causes of action.  Because the need to apply these

varying laws would result in chaos and jury confusion, plaintiffs' proposed nationwide class should be rejected.

### III.   PLAINTIFFS' CLAIMS TURN ON HIGHLY INDIVIDUALIZED PROOF, PRECLUDING CERTIFICATION OF THEIR ALTERNATIVE STATEWIDE CLASSES.

Plaintiffs' proposed class also fails to satisfy the predominance and superiority requirements for class certification (both on a nationwide and statewide basis) because their claims turn on inherently individualized factual evidence.  In order to satisfy Rule 23's predominance requirement, plaintiffs must show that "'questions of . . . fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly *and* efficiently adjudicating the controversy.'"  *In re HealthSouth*, 257 F.R.D. at 271 (alterations in original) (quoting Fed. R. Civ. P. 23(b)(3)); *see also Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009) (citations omitted) (the "predominance inquiry requires an examination of 'the claims, defenses, [and]  relevant facts . . . to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant'").  The "'predominance' and 'superiority' requirements under Rule 23(b)(3) play critical roles in certifying a class." *In re HealthSouth*,  257 F.R.D. at 276.  Where – as here – plaintiffs will have to "'introduce a great deal of individualized proof . . . to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3).'"  *Luna v. Del Monte Fresh Produce (Southeast), Inc.*, No. 09-12464, 2009 U.S. App. LEXIS 26421, at *6 (11th Cir. Dec. 3, 2009) (citation omitted).  *See also Babineau*, 576 F.3d at 1191 (class certification is inappropriate if the "'adjudication of [p]laintiffs' claims on a class basis would be swamped by individual factual inquiries'") (citation omitted).

As set forth below, plaintiffs will need to present highly individualized evidence at trial with respect to each of their causes of action. Accordingly, common issues do not predominate, and a class action would not be a superior method of adjudicating their claims. For this reason too, class certification is inappropriate.

A.     **Plaintiffs' "Defect" Claims – Which Underlie All Their Causes Of Action – Turn On Highly Individualized Evidence.**

Although state law varies in numerous material ways, "[n]o injury, no tort, is an ingredient of every state's law." *In re Bridgestone/Firestone*, 288 F.3d at 1017. This principle applies to each of plaintiffs' claims – plaintiffs cannot prevail on a theory of express or implied warranty, consumer protection or unjust enrichment without some evidence that their washing machines malfunctioned. *See, e.g., Briehl v. GMC*, 172 F.3d 623, 628 (8th Cir. 1999) (rejecting implied warranty, express warranty and statutory consumer fraud claims under multiple states' laws because the plaintiffs failed to allege that the product at issue did not "perform in a satisfactory manner"); *O'Neil v. Simplicity, Inc.*, 553 F. Supp. 2d 1110, 1115 (D. Minn. 2008) (plaintiff must "allege an ***actual manifestation*** of the defect ***that results in some injury*** in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment"), *aff'd*, 574 F.3d 501 (8th Cir. 2009); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997) (rejecting tort claims against manufacturer of allegedly defective car because plaintiffs' vehicles had not actually malfunctioned and "'purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own'") (citation omitted).[8]  But determining whether (and, if so, why) each proposed class

---

[8]     While proof of actual injury is not necessary to state a claim under Georgia's Uniform Deceptive Trade Practices Act, plaintiffs suing under that statute may only obtain injunctive relief – not damages – and may do so only if they can show that they are "likely to be damaged" by the defendant's deceptive trade practice in the future. *Silverstein v. P&G Mfg. Co.*, No. CV 108-003, 2008 U.S. Dist. LEXIS 91559, at *11 (S.D. Ga. Nov. 12, 2008).  A plaintiff who alleges that he or she was injured by a past purchase of an allegedly defective product "does not allege ongoing or future harm [and] has not shown that he is 'likely to be damaged' within the meaning" of the statute. *Id.*
*(cont'd)*

member experienced a problem with his or her machine – or is likely to experience one in the future – will require highly individualized inquiries.

For this reason, courts across the country have refused to certify proposed classes alleging product defect claims where – as here – many of the proposed class members have not experienced a problem with their products.  *See, e.g.*, *Cole*, 484 F.3d at 728-29 (upholding trial court's refusal to certify class of car owners alleging breach of warranty claims based on an alleged defect in their automobiles because the "vast majority of the members of this class never experienced any manifestation of the alleged defect" and therefore could not prove their claims under many states' laws); *Gable v. Land Rover N. Am., Inc.*, No. CV07-0376, 2008 U.S. Dist. LEXIS 82996, at *12-13 (C.D. Cal. Sept. 29, 2008) (denying class certification in automobile defect case; plaintiff "has not shown credibly that even a majority of the class members have experienced the defect" and therefore "has not met his burden of showing that common issues will predominate over individual issues in this case"); *Am. Suzuki Motor Corp. v. Super. Ct.*, 37 Cal. App. 4th 1291, 1298-99, 1301 (1995) (reversing trial court's decision certifying a warranty class because the vast majority of vehicles at issue worked properly and had never manifested the alleged defect), *modified*, 38 Cal. App. 4th 1017A (1995).

In *In re Microsoft Xbox 360 Scratched Disc Litigation*, No. C07-1121, 2009 U.S. Dist. LEXIS 109075, at *18-21 (W.D. Wash. Oct. 5, 2009), for example, the court denied certification of a nationwide class of owners of Xbox video game consoles.  Plaintiffs in that case alleged that the design of the machine increased the risk that game discs would become scratched.  *Id*. at *5-

_____
*(cont'd from previous page)*
As a result, the named plaintiffs here – who claim to have been injured in the past as a result of their purchase of a front load washing machine – lack standing to bring a claim for injunctive relief under the GUDTPA.  *See id.* at *12-13 (where plaintiffs' "harm is entirely past," they cannot "'raise a factual question about the likelihood of some future wrong'" and therefore "lack statutory standing to maintain an action under the UDTPA") (citation omitted).

6.  Defendant Microsoft argued that class certification was inappropriate because such problems occur only if "a game player misuses the machine by moving it while a disc is spinning inside," *id.* at *6, and therefore the vast majority of Xboxes have not – and never will – experience a dislodged disc.  In denying class certification, the court agreed, noting that "[p]laintiffs have alleged a defect that actually manifests in fewer than one percent of the Xbox consoles sold" and likely would not manifest itself in the vast majority of machines before they were discarded or replaced by consumers.  *Id*. at *20-21.  According to the court, if "'the defect has not manifested [during the limited useful life of the Xbox 360], the buyer has received what he bargained for'" – and could not state a valid product liability claim.  *Id*. at *21 (citation omitted, alteration in original).  In addition, the court noted that even those Xbox owners whose game discs had been scratched would have to present individualized proof that the injury was caused by a defect in the machine – rather than misuse.  As the court explained:  "Some plaintiffs might have suffered scratched discs because a pet dog . . . knock[ed] the machine off a shelf" while it was in use, while other "discs might have scratched when an overzealous [player] . . . unwittingly str[uck] the machine" while using it.  *Id*. at *21-22.  "Whether each user's actions constituted misuse, and whether his or her use/misuse caused the damage, would present individual issues of fact for the jury."  *Id*. at *22.

The same is true here.  As set forth at pages 9-12, *supra*, less than half of the putative class members' washing machines included the convoluted bellow that plaintiffs claim is defective, and less than one-tenth of one percent of the putative class members required a visit by a service technician to address alleged problems relating to odor, mold or mildew during the warranty period.  (Hill Decl. ¶ 9; Fuller Decl. ¶ 11.)  Thus, the overwhelming majority of proposed class members likely never experienced any problem with their washing machines (and certainly never complained about one).  These putative class members cannot prove that they

31

were injured by Electrolux's conduct.  *See, e.g.*, *In re Bridgestone/Firestone*, 288 F.3d at 1017;

*Briehl*, 172 F.3d at 628.

In addition, even those plaintiffs who claim that they experienced odors or mildew in

their machines would need to provide individualized proof that these problems were the result of

a defect – rather than some other cause.  As set forth above, some plaintiffs claim that their

machines experienced severe mold and mildew build-up despite normal use.  (*See* Am. Compl.

¶¶ 13-14.)  By contrast, other purchasers may have experienced odor or mildew problems only

after leaving wet clothes in the washer for an extended amount of time or installing their

machines in an excessively moist environment like a basement.  And Electrolux customer service

records indicate that the washing machine odor experienced by certain purchasers was the result

of problems with the water supply, not the washer itself.  (*See, e.g.*, EL2287 (customer "is on

well water and the smell is coming from the sulphur in the well water . . . there is nothing wrong

with the washer").)  Thus, just as in *In re Microsoft Xbox*, there is no one fact scenario that a jury

could evaluate to determine whether each proposed class member's alleged product was a result

of an inherent defect or owner misuse.  *See* 2009 U.S. Dist. LEXIS 109075, at *22; *see also Cox*

*House Moving, Inc. v. Ford Motor Co.*, No. 7:06-1218-HMH, 2006 U.S. Dist. LEXIS 81132, at

*12-13 (D.S.C. Nov. 6, 2006) (refusing to certify class of purchasers of automobiles with an

alleged engine defect; "even if the court assumes that the engine has a common defect, the court

would be forced to make individualized inquiries concerning the use, maintenance, and service

history of each class member's vehicle to determine whether the common defect exists in each

class member's engine and whether each class member has a cognizable warranty and implied

warranty claim").

In short, resolution of plaintiffs' claims would require a case-by-case inquiry regarding whether and why proposed class members' washers have exhibited a defect – or may do so in the future.  For this reason too, class certification is inappropriate.

**B.**     **Plaintiffs' Consumer Fraud Claims Also Turn On Other Highly Individualized Evidence.**

Adjudicating plaintiffs' consumer fraud claims will require other individualized inquiries as well.  Most notably, plaintiffs will need to prove that:  (1) Electrolux made one or more fraudulent statements to them; and (2) Electrolux's allegedly fraudulent statements caused their alleged injury or – depending on the jurisdiction – that they relied on statements by the defendant to their detriment.  The need for these individualized inquiries further demonstrates the predominance of individualized issues.

**1.**     **Electrolux's Statements About The Washers Varied.**

Despite the many variations in state consumer protection laws (*see* Appendix A, pp. 1-11), the fundamental premise of such claims under all states' laws is that the defendant engaged in *some* deceptive or unlawful act or practice.  *See, e.g.*, *Silverstein*, 2008 U.S. Dist. LEXIS 91559, at *11 (to satisfy Georgia's Uniform Deceptive Trade Practices Act, plaintiff must show that the defendant engaged in a "deceptive trade practice," as defined by the statute); *Port Elevator Brownsville, L.C. v. Gutierrez*, 198 F. App'x 362, 369 (5th Cir. 2006) (plaintiff alleging claims under the Texas Deceptive Trade Practices Act must present evidence of specific misrepresentations that constitute "'a false, misleading, or deceptive act or practice'") (citation omitted).[9]  Here, plaintiffs claim that Electrolux's promotional materials included certain

---

[9]     *See also Helena Chem. Co. v. Huggins*, No. 4:06-cv-2583-RBH, 2008 U.S. Dist. LEXIS 92449, at *26 (D.S.C. Nov. 13, 2008) (to recover under the South Carolina Unfair Trade Practices Act, the plaintiff must establish that "the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce"); *Wilens v. TD Waterhouse Group, Inc.*, 120 Cal. App. 4th 746, 756 (Cal. App. 2003) (California's Unfair Competition Law makes actionable "'any unlawful, unfair or fraudulent business act or practice'") (citation omitted); *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 245 (Wis. 2004), *rev'd on other grounds*, 735 N.W.2d 418 (Wis. 2007) (plaintiff
*(cont'd)*

33

misrepresentations regarding the quality of its washing machines and that Electrolux failed to disclose "mold and mildew problems" caused by a defect in the machines' bellows.  (*See* Pls.' Mot. at 18; Am. Compl. ¶ 30.)  Specifically, plaintiffs claim that Electrolux misrepresented to washing machine purchasers that "your laundry never looked so good" and that "your clothes feel fresher and last longer" when washed in a Frigidaire machine.[10]  (*Id*.)  These statements were made in some product brochures designed to explain the features of certain front load washing machines.  (*See, e.g.*, Electrolux 1385-1404.)  But other Electrolux brochures and promotional materials did not contain this language.  (*See, e.g.*, Electrolux 1445; Electrolux 1448; Electrolux 1425-26; Electrolux 1421-22.)  Thus, it cannot be assumed that all proposed class members were exposed to the allegedly misleading statements cited by plaintiffs.  Indeed, the named plaintiffs do not even allege that they viewed these statements, or any advertisement at all.  (Am. Compl. ¶¶ 13-17.)  As a result, jurors would be forced to consider which promotional materials (if any) each proposed class member was exposed to prior to purchasing his or her washer and whether the statements they contained were misleading.  This sort of individualized inquiry is not possible in a classwide setting.

2. **Plaintiffs' Statutory Consumer Protection Claims Require Highly Individualized Proof Of Causation And/Or Reliance.**

Another individualized element plaintiffs must prove to prevail on their consumer fraud claims is causation and/or reliance.  While consumer protection laws vary substantially from state to state with regard to the level of causation required to prove a consumer fraud claim (*see* Appendix A, pp. 9-10), nearly every state requires plaintiffs to prove a link between the

---

*(cont'd from previous page)*
asserting a Wisconsin Deceptive Trade Practices Act violation must allege that the defendant made "an 'assertion, representation or statement of fact that is untrue, deceptive or misleading'") (citation omitted).

defendant's conduct and the plaintiff's alleged loss (or likelihood of future loss). *See, e.g.*, *Silverstein*, 2008 U.S. Dist. LEXIS 91559, at *11 ("[U]nder Georgia's UDTPA, a plaintiff must show that he is 'likely to be damaged' ***by the defendant's deceptive trade practice***.") (emphasis added).[11]  Moreover, some states go further, requiring plaintiffs who assert claims for consumer fraud to prove that they relied to their detriment on the defendant's allegedly deceptive conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(A)-(B) (Vernon 2009) (a "consumer may maintain an action where . . . the use or employment by any person of a false, misleading, or deceptive act . . . is . . . relied on by a consumer to the consumer's detriment").[12]  As other courts have recognized, the need for causation-related inquiries defeats predominance where – as here – plaintiffs likely had varying reasons for purchasing the product at issue.  *See, e.g.*, *Nafar v. Hollywood Tanning Sys., Inc.*, No. 08-3994, 2009 U.S. App. LEXIS 17561, at *2, *24-26 (3d Cir. Aug. 5, 2009) (reversing class certification in case involving tanning products because consumers had different levels of knowledge about the risks of artificial tanning and would have reacted differently to more information about those risks); *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658-59 (D. Nev. 2009) (denying certification of consumer protection claims based on alleged misrepresentations in product labels for pet food because the court would have to

---

*(cont'd from previous page)*

[10]     As explained in Electrolux's pending motion to dismiss, such statements of opinion about a product's benefits are considered mere "puffery" and do not even give rise to a consumer fraud claim in the first place. (*See* Def.'s Mem. Of Law In Support Of Mot. To Dismiss Pls.' First Am. Compl. at 29, 37, 40 (filed August 31, 2009).)

[11]     *See also Tietsworth*, 677 N.W.2d at 245 (under Wisconsin's DTPA, plaintiff must show that he has suffered pecuniary injury "*as a result of*" defendant's false assertion, representation, or statement) (emphasis added); *Helena Chem. Co.*, 2008 U.S. Dist. LEXIS 92449, at *26 (to recover under the South Carolina DTPA, plaintiff must prove that he "suffered monetary or property loss *as a result of* the defendant's unfair or deceptive acts") (emphasis added).

[12]     *See also Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686-87, 693 (Tex. 2002) ("[r]eliance is an element of . . . plaintiffs' . . . DTPA 'laundry-list violations'"); Wyo. Stat. Ann. § 40-12-108(a) (2009) ("A person relying upon an uncured unlawful deceptive trade practice may bring an action . . . ."); *Debbs v. Chrysler Corp.*, 810 A.2d 137, 156 (Pa. Super. Ct. 2002) (stating that reliance is required for all Pennsylvania consumer protection act violations).

determine first whether each putative class member even saw the allegedly inaccurate label and whether his or her decision to buy the product was based on the misrepresentation, rather than some other factor "such as price, convenience, or . . . preference"); *Oshana*, 472 F.3d at 513-15 (affirming trial court's refusal to certify class alleging consumer fraud claims based on alleged misrepresentations about Diet Coke ingredients because it was likely that many, perhaps millions, of persons would have bought the product anyway).

This is all the more true in states that require a showing of reliance. Indeed, it is almost universally recognized that the need to establish reliance is a death knell for class certification because it requires individual, subjective evidence. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988); *Andrews*, 95 F.3d at 1025 (reversing class certification because of, *inter alia*, the need for plaintiffs to "show, on an individual basis, that they relied on the [alleged] misrepresentations"); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 435 (4th Cir. 2003).

This case is no different. In order to determine whether Electrolux's alleged misrepresentations or omissions caused each proposed class member's alleged injury (or whether putative class members relied on the alleged misrepresentations or omissions in states with a reliance requirement), a jury would have to consider a host of individualized questions, such as:

- ***Did the putative class member see the allegedly deceptive statements?*** A plaintiff cannot demonstrate reliance or causation unless he or she actually saw the allegedly misleading statements at issue. *See Beck v. Prupis*, 162 F.3d 1090, 1097 (11th Cir. 1998) (claims based on an allegation of fraud fail where plaintiff "presented no evidence that he actually saw, let alone relied upon, any false . . . statements" by defendant), *aff'd*, 529 U.S. 494 (2000); *De Bouse v. Bayer AG*, No. 107528, 2009 Ill. LEXIS 2306, at *7 (Ill. Dec. 17, 2009) (plaintiff alleging consumer fraud claims based on defendant's failure to disclose information about a product must establish that he or she saw or heard an untrue or deficient statement by the defendant and was deceived by it).

- ***Did Frigidaire's statements influence each buyer's purchase?*** Even if plaintiffs could prove that all proposed class members saw the allegedly misleading statements at issue (which they obviously cannot), they would still have to prove that those statements had an effect on each purchaser's decision to buy his or her washing machine. This would require an individualized inquiry into the reasons why each proposed class member

bought his machine and whether that decision would have been different if Electrolux had never stated that its machines made clothes "fresher" and "cleaner."

- ***Did each proposed class member know that front load washing machines work best with occasional owner maintenance?*** Plaintiffs' proposed class period spans four years, from March 2004-March 2008. During that time, various media outlets – including *Consumer Reports* – published information regarding the potential for smells, mildew or mold in front load washing machines that are not properly maintained – and provided tips for how best to avoid such problems. (*See* pp. 7-8, *supra*.) Many consumers in the market for major home appliances research the pros and cons of various options before making a purchase – as evidenced by *Consumer Reports*' circulation of four million (which, of course, does not include individuals who borrow copies of the magazine or read it in a library or book store without purchasing it). As a result, many proposed class members were likely aware – before they purchased their machines – about the potential for odors in front load washers and how they can be prevented. A jury could find that a plaintiff who decided to buy a front load washer with full knowledge of the potential risk of odor, mildew or mold cannot demonstrate causation for purposes of plaintiffs' consumer fraud claims.

- ***Would each proposed class member have purchased the machine even if he had been told the allegedly withheld information?*** As set forth above, front load washers are extremely energy-efficient. Many purchasers likely selected their washing machines based on concerns regarding energy efficiency, and would have been willing to perform owner maintenance on a front load washer in order to obtain the benefit of saving water. *See* Lisa Davis, "Woman vs. Washing Machine," *The Anniston Star* (Anniston, Ala.), Oct. 4, 2009, at 31 (attached as Ex. 16) (editorial by front load washer user whose original machine experienced mold odors and who purchased another front load washer to replace it because she "like[s] to conserve water and [she thinks] they clean clothes better").[13] Other purchasers may have bought their machines because they like the way front load washers look, because these washers are generally more gentle on clothing, or because they prefer the convenience of the front load washer's door. As a result, a jury will be unable to make a uniform decision as to whether ***all*** proposed class members would never have purchased their front load machines if more information had been provided about potential odor or build-up.

---

[13]    As one consumer noted in a comment to an online Consumer Reports article regarding the potential for mold build-up in front load washing machines:

> Our front loader has been fine, but we do two things: 1) leave the washer door open for the night after we have washed our last load of the day, and 2) occasionally wipe the door gasket. Honestly, wiping the door gasket is kind of like having to clean your stove or refrigerator shelves. No, you don't have to do this, but after awhile it gets nasty if you don't. Is this a defect? I don't consider it to be one.

*See* Comments to "Mold Can Be A Problem For Some Front-Loading Washers." ConsumerReports.org (Aug. 28, 2008), *available at* http://blogs.consumerreports.org/home/2008/08/mold-on-washers.html (last visited Jan. 12, 2010).

For all of these reasons, it would be impossible for a jury to evaluate the causation and/or reliance elements of plaintiffs' consumer fraud claims without individualized determinations.

### C.   **Plaintiffs' Warranty Claims Similarly Turn On Individualized Evidence.**

Plaintiffs assert three warranty-based claims – breach of implied warranty, breach of express warranty under state law and a federal statutory warranty claim under the Magnuson-Moss Warranty Act.  As noted above, these claims are highly individualized because plaintiffs must prove that their washing machines in fact malfunctioned (and, in the case of the implied warranty claim, that they were not fit for washing clothing).  In addition, these claims cannot be adjudicated on a classwide basis because:  (1) many of the relevant states require plaintiffs to prove that they provided notice to the defendant of the alleged breach, which would necessarily involve individualized inquiries; and (2) plaintiffs' express warranty claims require a number of other individualized inquiries.[14]

### 1.   **Plaintiffs Must Present Individualized Evidence Of Notice.**

While state law varies regarding what constitutes proper notice, it is almost universally recognized that plaintiffs asserting warranty claims must prove that they notified a defendant of an alleged malfunction "within a reasonable time" – and allowed the defendant an opportunity to

---

[14]     As set forth in n. 7, *supra*, plaintiffs' MMWA claims rise and fall on their state-law warranty claims. Indeed, plaintiffs themselves admit that "[c]ourts typically look to substantive state law to determine whether a Magnuson-Moss Warranty Act . . . claim is viable" and therefore "predominance is met with respect to [plaintiffs' MMWA] claim" to the extent that "this requirement is satisfied as to [p]laintiffs' warranty claims" under state law. (Pls.' Mot. at 17 (citing *Johnson v. Jaguar Cars Inc.*, No. 1:05-CV-3161-RLV, 2006 U.S. Dist. LEXIS 41166, at *7 (N.D. Ga. June 6, 2006)).)  Indeed, the MMWA even requires plaintiffs to provide notice to the defendant, as is required by many states' warranty laws.  *See Lewis v. Mercedes-Benz USA, LLC*, No. 1:03-cv-4000, 2004 U.S. Dist. LEXIS 29484, at *7 (N.D. Ga. Sept. 13, 2004) ("Under the Magnuson-Moss Warranty Act, . . . a litigant must show that prior to filing suit he provided the defendant with an opportunity to cure the alleged defect and that the defendant nevertheless refused to cure the defect.").  For these reasons, courts have consistently found that if a plaintiff's state law warranty claims are too individualized for class treatment, so too is the plaintiff's MMWA claim.  *See, e.g.*, *Dex-Cool*, 241 F.R.D. at 315 (because the MMWA "is essentially a vehicle for vindicating state-law warranty claims in federal court," individualized legal and factual questions relevant to establishing a state law warranty claim also prevented class certification of MMWA claim); *Barbarin v. Gen. Motors Corp.*, No. 84-0888, 1993 U.S. Dist. LEXIS 20980, at *11-12 & n.8 (D.D.C. Sept. 22, 1993) (denying certification of MMWA and state law warranty claims because of factual and legal variations).

cure – before bringing express or implied warranty claims.  *See, e.g.*, *Oden & Sims Used Cars, Inc. v. Thurman*, 301 S.E.2d 673, 675 (Ga. Ct. App. 1983) (section 11-2-607(3)(a) of the Georgia Code "'expressly requires notice of 'any' breach'" of warranty) (citation omitted); Wis. Stat. Ann. § 402.607(3)(a) (West 2003) (the buyer of a product "must within a reasonable time after the buyer discovers or should have discovered any breach [of warranty] notify the seller of breach or be barred from any remedy").[15]

Court after court has recognized that the need for such individualized inquiries precludes certification of warranty claims.  In *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 624-25 (S.D. Fla. 2008), for example, the court refused to certify a class of dentists alleging claims for breach of express and implied warranty based on their purchase of dental implant products. Applying Florida law, the court found that "each putative class member must demonstrate that he or she gave the required notice of the breach to Defendant within a reasonable time."  *Id.* at 625. "[C]learly," the court concluded, "this is an individualized factual inquiry, as some potential class members may have provided timely notice, while others may have provided untimely notice of Defendant's alleged breach or no notice at all."  *Id.*  For this and other reasons, the court found that "individual questions of fact predominate over those common to the class."  *Id.*; *see also Danielson*, 2007 U.S. Dist. LEXIS 18609, at *13 (denying certification of nationwide warranty class because, *inter alia*, "[w]hether each plaintiff and class member made the proper notifications [under the applicable state's law] is an individual issue that predominates over common issues in this case"); *Caruso v. Celsius Insulation Res., Inc.*, 101 F.R.D. 530, 536 (M.D.

---

[15]     *See also Andrade v. Pangborn Corp.*, No. C 02-3771, 2004 U.S. Dist. LEXIS 22704, at *63-64 (N.D. Cal. Oct. 22, 2004) (plaintiff alleging breach of implied warranty under California law must prove that he "took reasonable steps to notify the defendant within a reasonable time that the product did not have the expected quality"); *Hitachi Elec. Devices (USA), Inc. v. Platinum Techs., Inc.*, 621 S.E.2d 38, 40 (S.C. 2005) (buyer's failure to provide seller with seasonable notice of breach precluded recovery for breach of warranty under South Carolina law); *McGown v. Bridgestone/Firestone, Inc.*, No. 9:05-CV-9, 2005 U.S. Dist. LEXIS 25598, at *8 (E.D. Tex. Oct. 18, 2005) (under Texas law, plaintiff must have notified defendant of breach prior to bringing action).

Pa. 1984) (denying certification of warranty-based claims because, *inter alia*, "whether notice was given to breaching parties, and if so, the kind of notice . . . present[s] individual questions of law and fact").

This case is no different.  In order to determine whether the notice requirements have been met, the jury will have to examine each proposed class member's interactions with Electrolux.  While some proposed class members – like plaintiff Terrill – may have contacted Electrolux after noticing the alleged problems with their machines but before filing suit (*see* Am. Compl. ¶ 13), many others likely did not.  And even those who did contact Electrolux regarding problems with their washers may have waited an unreasonable amount of time before doing so. Some putative class members may have called Electrolux to complain about odors or mildew immediately upon noticing them.  But others – like plaintiff Brown (who waited three years) – may have taken an unreasonable amount of time to alert the company to the alleged problems with their machines.

Plaintiffs argue that:  (1) the notice requirement can be proven on a classwide basis because Electrolux had constructive notice of a problem in all of its front load washing machines as early as 2004; and (2) simply filing suit satisfies the notice requirement under Georgia law. (Pls.' Mot. at 15.)  Both arguments fail.  As an initial matter, a manufacturer's mere awareness that a product may generally be susceptible to problems is not enough to satisfy the notice requirement under many states' laws.  *See Oden*, 301 S.E.2d at 675 (explaining that the UCC "mandate[s] notice regardless whether either or both parties had actual knowledge of breach" because "[t]he purpose of the notice is to advise the seller that he must meet a claim for damages as to which, rightly or wrongly, the law requires that he shall have early warning") (citation and internal quotations omitted).  Rather, courts have held, the notice requirement is only satisfied where a manufacturer is alerted – within a reasonable amount of time – that a ***particular*** buyer's

machine has exhibited an alleged defect, so that it can investigate and attempt to cure the problem. *Id.*; *see also Wilcox v. Hillcrest Mem'l Park*, 696 S.W.2d 423, 424-25 (Tex. App. 1985) ("It would be untenable to allow a buyer . . . to recover damages for breach of warranty from a remote seller or manufacturer who was never even made aware that the product in question was defective and who, consequently, never had an opportunity to remedy the defect to the buyer's satisfaction before litigation was commenced or even to inspect the product to ascertain if indeed a defect existed."). In any event, plaintiffs' contention is factually wrong. In 2004, Electrolux had received almost no complaints about alleged odors or mold, and even by the end of the class period four years later, only a very small percentage of the putative class members had complained about such problems with their machines. (*See* pp. 9-12, 32, *supra*; *see also* Fuller Decl. ¶ 12.)

Plaintiffs' assertion that they satisfied the notice requirement simply by filing suit is also incorrect. The notice requirement for breach-of-warranty claims is designed to put the defendant on notice that a claim for damages is ***forthcoming*** and allow the defendant the opportunity to remedy the alleged breach before suit. *See Oden*, 301 S.E.2d at 675. This purpose would not be served if plaintiffs could fulfill the notice requirement merely by bringing a lawsuit. For this reason, courts in Georgia and elsewhere have made clear that plaintiffs alleging breach of express or implied warranty must provide notice to the defendant ***before*** filing suit. For example, in *Lewis*, 2004 U.S. Dist. LEXIS 29484, at *13-14, the court granted the defendant car manufacturer's motion to dismiss plaintiffs' express and implied warranty claims under Georgia law, as well as their claims under the MMWA, because plaintiffs failed to allege that they notified the defendant of the alleged breach of warranty before filing suit. According to the court, even though the plaintiffs had contacted a local dealership regarding the alleged problems with their car – and filed suit only after the dealership was unable to fix the problems – plaintiffs

did not give *the manufacturer* itself reasonable notice and an opportunity to cure prior to bringing a lawsuit. *Id.* at *12-13. Their warranty claims thus failed as a matter of law. *Id.* at *13-14; *see also Hobbs v. GMC*, 134 F. Supp. 2d 1277, 1285 (M.D. Ala. 2001) ("[I]n the context of economic harm rather than personal injury, the filing of a lawsuit is not considered to be sufficient notice under Alabama law" for a breach of warranty claim, and "[n]otice must, therefore, precede the filing of the complaint."); *Brookings Mun. Utils., Inc. v. Amoco Chem. Co.*, 103 F. Supp. 2d 1169, 1176 n.6 (D.S.D. 2000) (holding that "notice by lawsuit is inadequate under § 2-607(3) [of the UCC] as a matter of South Dakota law"); *In re Air Bag Prods. Liab. Litig.*, 7 F. Supp. 2d 792, 804 (E.D. La. 1998) (applying Texas law; "[p]laintiffs' implicit argument that the filing of this lawsuit constituted notice does not satisfy the statutory standard, and precludes plaintiffs recovery on their implied warranty claims"); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590 (Ill. 1996) ("Only a consumer plaintiff who suffers a personal injury may satisfy the section 2-607 notice requirement by filing a complaint stating a breach of warranty action against the seller.").

The Georgia cases plaintiffs cite are not to the contrary. *Hudson v. Gaines*, 403 S.E.2d 852 (Ga. Ct. App. 1991) (Pls.' Mot. at 15), involved a unique scenario: the sale of two stolen dump trucks. The court there found that the notice requirement would serve no purpose under such a circumstance because plaintiff's claims involved an incurable defect: a stolen dump truck cannot become un-stolen. Since there was nothing to investigate, no defect to cure, and no way to mitigate damages, the court excused compliance with the pre-suit notice and opportunity to cure requirement.[16]

---

[16]     And in *SunTrust Bank v. Hightower*, 660 S.E.2d 745, 748-49 (Ga. Ct. App. 2008) (Pls.' Mot. at 15), the court was interpreting the notice requirement applicable under a Georgia liquidated damages statute – not warranty claims – and merely noted that in *Hudson*, the court held that "[w]here law enforcement officials had confiscated

*(cont'd)*

By contrast, here, the defect alleged by plaintiffs was, by its very nature, curable. Indeed, plaintiffs themselves admit that Electrolux provided advice to consumers who contacted the Company regarding how the odor and mildew problems with their machines could be remedied and prevented in the future.  (Am. Compl. ¶¶ 13-15.)  Where such advice was not sufficient, the Company paid for third-party technicians to provide on-site service for machines that were covered by warranty – and even some that were no longer within the warranty period. (Fuller Decl. ¶¶ 8, 9, 11.)  And in cases where the technician determined that the problem could not be remedied through owner maintenance, Electrolux often offered to replace – without cost – the allegedly defective bellow on the consumer's washing machine.  (Hill Decl. ¶ 15-16.)

In short, the jury will be unable to determine whether each proposed class member can prevail on his or her warranty claims without an individualized investigation into whether – and if so, when – he or she provided Electrolux with notice of the alleged breach.  For this reason too, individualized facts prevail and plaintiffs' motion should be denied.

> **2.      Plaintiffs' Express Warranty Claims Turn On Additional Individualized Inquiries.**
>
> > (a)      <u>Plaintiffs Must Each Prove Individually That Their Machines Malfunctioned Within The One-Year Warranty Period.</u>

As plaintiffs noted in their motion, the washing machines at issue were covered by a one-year express warranty that required the company to pay for "[l]abor and replacement parts which prove to be defective in materials or workmanship."  (Pls.' Mot. at 4.)  Plaintiffs allege that Electrolux "breached its warranty [to consumers] by failing to cure a common defect inherent in all of its washing machines" that "relates to the design of the . . . boot and its failure to prevent mold and mildew from developing in the washing machine, including the inner wash basket."

_____

*(cont'd from previous page)*
vehicles as stolen property before suit was brought for breach of vehicular title warranties, service of the lawsuit was
*(cont'd)*

(Pls.' Mot. at 14.)[17]  Therefore, to establish a valid claim for breach of warranty, plaintiffs must allege that they experienced problems with their washing machines within one year of buying them.  *See, e.g.*, *Fort Oglethorpe Assocs. II, Ltd. v. Hails Constr. Co. of Ga.*, 396 S.E.2d 585, 664 (Ga. Ct. App. 1990) (trial court properly granted summary judgment on express warranty claim where the alleged problem occurred after the one-year express warranty at issue had expired); *Lopez v. Smith Corona, Inc.*, No. 07-99-0272-CV, 2000 WL 798799, at *2 (Tex. App. June 21, 2000) (trial court properly dismissed express warranty claim because alleged defect in plaintiff's word processor did not manifest until 41 days after the 90-day warranty period ended).

Plaintiffs cannot do so on a classwide basis since some purchasers may have used their machines without incident for more than a year before experiencing any odor or mold (and as noted above, most have never experienced such problems to this day).  The experiences of the named plaintiffs demonstrate this problem.  Plaintiff Boyd alleges that she bought her washer nearly two years before she experienced any problems with the machine, and plaintiff Vogler alleges that he first had an issue with his washer approximately eighteen months after buying it. (*See* Am. Compl. ¶¶ 15, 16.)  By contrast, plaintiff Pack claims that she started experiencing "mold and mildew problems with her machine" only a month after she bought it, and plaintiff Brown claims that he first noticed a problem with his machine approximately two months after purchase.  (*Id.* ¶¶ 14, 17.)  Obviously, consumers who allege problems outside the warranty

---

*(cont'd from previous page)*
adequate notice of the claim."  *Id.*

[17]     The washing machines also included a 25-year limited warranty that states that Frigidaire will pay for a "Replacement part for an inner wash basket that breaks due to a defect in materials or workmanship."  (Frigidaire Tumble Action Washer Warranty; Electrolux Major Appliance Warranty Information.)  While plaintiffs' motion suggests that the alleged defect in the bellow can cause mold in the inner wash basket, nowhere in their motion do they claim that the wash basket itself is defective or causes the problems of which they complain.  And the twenty-five year warranty makes clear that it covers only "replacement" of an "inner wash basket ***that breaks*** due to a defect in materials or workmanship."  (Pls.' Mot. at 4 (emphasis added).)  Thus, the twenty-five year warranty is irrelevant to plaintiffs' claims.

44

period would present very different claims to jurors than those who allege problems within one year of purchase. This too makes plaintiffs' claims inappropriate for class certification.

> (b)    Plaintiffs Must Prove Individually That Electrolux Failed To Repair Any Allegedly Defective Parts On Their Machines.

Plaintiffs' express warranty claims are based on the premise that Electrolux promised in its one-year warranty to repair or replace any defective parts in the proposed class members' washing machines. In order to prevail on a claim for breach of an express "repair and replace" warranty, plaintiffs must prove that each proposed class member asked Electrolux to cure a problem with his or her machine that was covered by the express warranty, and that the company refused to do so within a reasonable time. *See Knight v. Am. Suzuki Motor Corp.*, 612 S.E.2d 546, 550-51 (Ga. Ct. App. 2005). As the court explained in *Knight*, an express "warranty is not breached simply because a [product] is found on delivery or at some time thereafter within the warranty period to have a defective part or [an] operational deficiency." *Id.* at 549 (second alteration in original, citation and internal quotation marks omitted). Instead, "it is the refusal to remedy [that defect] within a reasonable time, or a lack of success in the attempts to remedy [that] would constitute a breach of warranty. *Id.* Accordingly, the plaintiff must prove that he "notified the warrantor of the defect as a condition to proving breach of warranty, and the warrantor ha[d] a reasonable time in which to repair the defect" but did not do so. *Id.* at 550 (alteration in original, citation and internal quotation marks omitted); *see also Brothers v. Hewlett-Packard Co.*, No. C-06-02254, 2007 U.S. Dist. LEXIS 13155, at *5, *13-15 (N.D. Cal. Feb. 12, 2007) (a warranty promising to "repair or replace . . . defective component parts or hardware products" in a computer "does not guarantee against design defects, it guarantees against defects in materials and workmanship" and promises to cure them); *Cosman v. Ford Motor Co.*, 674 N.E.2d 61, 66 (Ill. 1996) (a replace and repair warranty "warrants only that the

dealer will repair, replace, or adjust defects if parts of the [vehicle] in fact do malfunction.  It does not warrant the quality of the [vehicle] or its performance"); *In re GMC Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1532 (E.D. Mo. 1997) ("[T]he warranties simply do not promise that the vehicles are free of defects."), *aff'd sub nom.*, *Briehl v. GMC*, 172 F.3d 623 (8th Cir. 1999); *Mauro v. GMC*, No. CIV. S-07-892 FCD GGH, 2008 U.S. Dist. LEXIS 93897, at *25-26 (E.D. Cal. July 14, 2008) (striking class claims in warranty case because "many class members have not experienced issues from the defect or presented their vehicles to an authorized dealer for repair").  Thus, even if plaintiffs could prove that everyone in the proposed class experienced a problem with his or her machine during the warranty period, each proposed class member would still have to show that he or she requested repair and that the request was denied.

This will require individualized evidence.  As set forth above, Electrolux contracted with third-party technicians to perform free service calls for customers who complained of problems within the warranty period – and for dozens of other customers whose warranties had already expired.  (Fuller Decl. ¶ 18.)  In cases where these technicians determined that the problem could not be solved through cleaning or other maintenance, the technician would replace the bellow on the consumer's machine.  Obviously, those individuals whose machines ***did*** receive a new bellow will be unable to prove that Electrolux breached its warranty.  *See Brothers*, 2007 U.S. Dist. LEXIS 13155, at *9-12, *14 (plaintiff could not prevail on express warranty claim where defendant replaced the allegedly defective part in plaintiff's computer; defendant "could not have breached the Limited Warranty by acting in conformance with it").  By contrast, if Electrolux refused to repair any putative class members' machines during the warranty period, they would present very different claims.  For this reason, too, individualized issues predominate, and class certification is inappropriate.  *See Cunningham Charter Corp.*, 258 F.R.D. at 327-28, 334 (plaintiffs failed to satisfy the typicality, commonality, and predominance requirements with

regard to their proposed warranty class because some product owners may not have made a claim for repair within the warranty period and some of those who did make a claim may have received repairs consistent with the warranty, making individualized inquiries necessary).

> (c)    Under Many States' Laws, Plaintiffs Would Have To Make Individualized Showings Of Reliance.

Some states, like Georgia and Texas, impose a reliance requirement for express warranty claims. *See, e.g.*, *Servais v. Philbrick*, 380 S.E.2d 496, 497 (Ga. Ct. App. 1989) ("To recover for an express warranty it is necessary to show that the statement . . . was relied upon as such.") (citation and internal quotations omitted); *Ackerman v. Wyeth Pharms.*, 471 F. Supp. 2d 739, 744 (E.D. Tex. 2006) ("In Texas, reliance is not only relevant to, but an element of proof, for sustaining a claim for breach of an express warranty."), *aff'd*, 526 F.3d 203 (5th Cir. 2008). Proposed class members in those states will therefore have to prove not only that they were aware of the "repair and replace" warranty offered by Electrolux at the time that they purchased their washing machines, but also that they relied on that warranty when deciding to buy the washers. This inquiry will necessarily be individualized. After all, some proposed class members will likely admit that they did not even read the warranty before purchasing a washer. By contrast, other proposed class members may be diligent about buying appliances with the most extensive or longest warranties. Such variations further defeat any finding of predominance. *See Caruso*, 101 F.R.D. at 536 (denying certification of warranty-based claims because, *inter alia*, "[r]eliance by individual purchasers on written and oral warranties . . . [would] present individual questions of law and fact").

**D.    Plaintiffs' Unjust Enrichment Claims Are Similarly Individualized.**

To the extent states recognize unjust enrichment as a valid claim, plaintiffs asserting such a claim must make some showing that the circumstances of each proposed class member's washing machine purchase make it unjust for Electrolux to keep the money that he or she paid

for it.  *See, e.g.*, *Imps. Serv. Corp. v. GP Chems. Equity, LLC*, No. 1:07-CV-0745-JOF, 2009

U.S. Dist. LEXIS 74994, at *29 (N.D. Ga. Aug. 24, 2009) (Georgia law requires proof that the

defendant "has been conferred a benefit by the [plaintiff] which the [defendant] equitably ought

to return or compensate for") (citation and internal quotation marks omitted).[18]  Whether

plaintiffs can make such a showing will depend on many of the same individualized facts that

make certification improper for their consumer fraud and warranty claims.

     For example, in order to determine whether Electrolux's actions were "unjust," such that

it would be improper for the Company to retain payments for the subject washing machines, a

jury would need to consider what representations each putative class member received from

Electrolux about the machine and what he or she knew about front load washing machines when

he or she purchased the product.  In addition, a jury would need to determine whether and to

what degree each putative class member's washer exhibited a problem.  For this reason, court

after court has recognized that unjust enrichment claims based on alleged product defects – like

those here – do not satisfy the predominance requirement for class certification.  *See, e.g.*,

*Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 586 (N.D. Ill. 2005) (refusing to certify class

of fountain soda purchasers asserting unjust enrichment claims because "individualized issues of

detriment and whether each member was tricked would predominate over any common issues of

law or fact"); *Clay*, 188 F.R.D. at 501 (denying certification of class of tobacco purchasers

---

[18]     *See also Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 764 (S.C. 2009) (unjust enrichment claims under South Carolina law require proof of:  "(1) [a] benefit conferred by [the] plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value") (alteration in original, citation and internal quotation marks omitted); *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009) (under Wisconsin law, unjust enrichment claims require proof of "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof") (citation and internal quotation marks omitted).

alleging unjust enrichment claims because "the defendants' liability for unjust enrichment to a particular plaintiff depends on the factual circumstances of the particular purchase at issue").

For example, in *In re Rezulin Products Liability Litigation*, the court refused to certify a class of users of the prescription drug Rezulin who asserted unjust enrichment and other claims based on the defendant's alleged failure to disclose certain potential side-effects of the drug.  210 F.R.D. 61, 64 (S.D.N.Y. 2002).  The court explained that plaintiffs' unjust enrichment claims could not be tried on a classwide basis because plaintiffs would need to demonstrate that they were harmed by the defendant's conduct, that the risks of the drug outweighed its benefits to each plaintiff, and/or that the defendant's conduct inflated the price of the drug or resulted in some other inequity that would make it appropriate to transfer money to the plaintiffs.  "Every one of these theories would involve issues individual to the particular class member."  *Id*. at 68.  As a result, the court concluded that the need for individualized evidence precluded class treatment.

The same is true here.  In order to determine whether it was unjust for Electrolux to retain the money that any one proposed class member paid for his or her washing machine, the jury would have to consider – among other things – whether that proposed class member has ever experienced a problem with the machine, whether the problem was easily remedied by routine maintenance and whether the proposed class member continues to use the machine to this day. A jury would be hard-pressed to find that it was "unjust" for Electrolux to profit from the sale of a washer that has never had any problems and is still being used daily by its purchaser four or five years later.  But that same jury could reach a very different result with regard to a purchaser who only used his or her washer a few times before mold build-up occurred – and then bought a new machine to replace it.  And the jury could have yet another reaction to the claims of a purchaser who experienced odor in his or her washer once and remedied the problem by cleaning

49

the machine on a regular basis.  In addition, the outcome of each purchaser's unjust enrichment

claim will vary based on whether the bellow on his or her machine was replaced by Electrolux or

whether he or she received a rebate from the Company toward the purchase of a new machine.

(*See* Hill Decl. ¶¶ 15-17.)  Put simply, there is no way to determine whether the circumstances of

each proposed class member's transaction were "unjust" without examining those circumstances.

And such individualized examinations are not possible in a class trial.  Thus, plaintiffs' class

proposal fails with regard to this cause of action as well.

### E.   Electrolux's Affirmative Defenses Present Additional Individualized Issues.

Finally, a trial of plaintiffs' claims will require highly individualized inquiries regarding a

number of affirmative defenses, such as (depending on the applicable state law):  product misuse,

accord and satisfaction, waiver, contributory and comparative negligence and expiration of

limitations periods.  *See, e.g.*, *Huynh v. Ingersoll-Rand*, 16 Cal. App. 4th 825, 831 (Cal. Ct. App.

1993) (the affirmative defense of product misuse applies "when [the plaintiff's] misuse [of the

product] is the actual cause of the plaintiff's injury"); *Munson v. Strategis Asset Valuation &*

*Mgmt.*, 363 F. Supp. 2d 1377, 1381 (N.D. Ga. 2005) (the affirmative defense of accord and

satisfaction applies where defendant can prove:  "(1) a previous valid obligation; (2) the

agreement of all the parties to the new contract; (3) a mutual intention by the parties to substitute

the new contract for the old one; and (4) a valid new contract").  As set forth above, Electrolux

will have different defenses to different proposed class members' claims based on the unique

circumstances of their cases.  Some putative class members' alleged problems with their

machines may have been caused by product misuse or a source other than a product defect.

Other putative class members may not have a valid claim because they reported the problem to

Electrolux and it was solved by maintenance to – or replacement of – the bellow, fulfilling the

company's contractual obligations.  Other putative class members' claims may be subject to the

defense of accord and satisfaction because they accepted rebates toward the purchase of new washing machines.  And still other putative class members' claims may fail as a matter of law because they did not sue within the applicable limitations period.  Courts have recognized that class certification is inappropriate where such individualized defenses are likely to arise at trial. *See Danielson*, 2007 U.S. Dist. LEXIS 18609, at *13 (denying class certification of nationwide warranty and other claims because, *inter alia*, "[d]efendants . . . assert several defenses which raise individual issues, such as payment, accord and satisfaction, release, and waiver"); *Parks Auto. Group, Inc. v. Gen. Motors Corp.*, 237 F.R.D. 567, 571 (D.S.C. 2006) (refusing to certify nationwide class alleging breach of warranty and other claims because "affirmative defenses," such as accord and satisfaction, release, waiver and comparative negligence, "would require individualized inquiry").  For this reason too, individualized questions of fact overwhelmingly predominate over any common factual questions and would render a class trial in this action unmanageable.

## IV.   PLAINTIFFS CANNOT SATISFY RULE 23'S TYPICALITY AND ADEQUACY REQUIREMENTS WITH RESPECT TO THEIR WARRANTY CLAIMS.

"Typicality" and "adequacy" are critical prerequisites to class certification because the claims of the absent class members in a class action rise and fall with the claims of the class representatives.  *See Hillis v. Equifax Consumer Servs.*, 237 F.R.D. 491, 499 (N.D. Ga. 2006) ("'The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class.'") (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 389 (6th Cir. 1998)); *Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 677 (S.D. Fla. 2007) ("The focus of typicality is whether the class representative's interest is aligned enough with the proposed class members to stand in their shoes for purposes of the litigation and bind them in a judgment on the merits.").  Where the named plaintiffs' claims are subject to unique defenses,

they cannot stand in the place of the absent class members – and therefore fail as class representatives. *See Boca Raton Cmty. Hosp. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 694 (S.D. Fla. 2006), *aff'd*, 582 F.3d 1227 (11th Cir. 2009); *see also Shelley v. AmSouth Bank*, No. 97-1170-RV-C, 2000 U.S. Dist. LEXIS 11429, at *15-16 (S.D. Ala. July 25, 2000) (denying class certification of fraud class where named plaintiffs were subject to unique defenses based on the applicable statute of limitations); *Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668 (M.D. Fla. 2000) (denying certification of discrimination claims where named plaintiffs were atypical because they were subject to a "multitude of defenses" that would likely "preoccupy Plaintiffs to the detriment of purported class members"). Plaintiffs here fail the typicality and adequacy requirements with regard to their warranty-based claims for several reasons.[19]

*First,* three of the named plaintiffs experienced their alleged problems with their washers after the expiration of the warranty period. As noted above, the express warranty for defects in "materials or workmanship" that accompanied Electrolux's front load washers expired one year after purchase. But three of the named plaintiffs allege that they experienced problems with their machines after the end of the warranty period. Plaintiff Boyd alleges problems with her machine nearly two years after purchase. (*See* Am. Compl. ¶ 16.) Plaintiff Terrill alleges that he did not experience any problems with his machine until over a year after purchase. (*Id.* ¶ 13.) And plaintiff Vogler alleges that he did not experience a problem with his machine until eighteen months after purchase. (*Id.* ¶ 15.) This fundamental weakness in their claims renders them atypical and inadequate class representatives. *Cf. Angel v. Goodman Mfg. Co., L.P.*, 617 F.

---

[19]     Electrolux has not yet had the opportunity to conduct the discovery necessary to determine whether the proposed class representatives are also subject to unique defenses with regard to their statutory consumer protection and unjust enrichment claims. As the Court is aware, Electrolux has requested class certification discovery with regard to the named plaintiffs – including named plaintiff depositions – but plaintiffs have refused to provide it. Such discovery is likely to reveal additional information regarding the named plaintiffs' ability *vel non* to fairly and adequately represent the proposed class. Electrolux will supplement its opposition to class certification to address any additional arguments revealed by that discovery if it is allowed.

Supp. 2d 1120, 1126 (N.D. Okla. 2008) (dismissing class claims where the express warranty applicable to the named plaintiff's air conditioner expired before the alleged defect in her air conditioner manifested itself, and the named plaintiff's claims thus failed as a matter of law), *aff'd*, 330 F. App'x 750 (10th Cir. 2009).

**Second**, two of the named plaintiffs – Boyd and Pack – failed to provide any notice of breach, while two others – Terrill and Brown – failed to provide such notice within a "reasonable" amount of time.

Boyd, Pack, Terrill and Brown all live in states that require a plaintiff asserting breach of warranty to provide notice of the alleged problem within a reasonable period of time. *See Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 87 Cal. Rptr. 3d 5, 20-21 (Cal. Ct. App. 2008) (breach of warranty claims require reasonable notice); *Knight*, 612 S.E.2d at 549 ("Under Georgia law, a customer must establish that he notified the warrantor of the defect as a condition to proving breach of warranty, and the warrantor has a reasonable time in which to repair the defect."); *Hitachi Elec. Devices (USA)*, 621 S.E.2d at 40-41 (stating that "a buyer who has failed to give seasonable notice of breach is 'barred from any remedy'" under a theory of breach of warranty) (citation omitted); *Wilson v. Tuxen*, 754 N.W.2d 220, 232 (Wis. Ct. App. 2008) ("[T]he buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.") (citation and internal quotation marks omitted).  Here, both plaintiff Boyd (who lives in Georgia) and plaintiff Pack (who lives in South Carolina) failed to allege that they gave Electrolux *any* notice of the alleged breach of warranty or an opportunity to cure.  This is a fatal defect in their claims, rendering them inadequate class representatives. *See Lewis*, 2004 U.S. Dist. LEXIS 29484, at *13-14 (granting motion to dismiss warranty claims where plaintiffs failed to adequately plead notice of defect).

Moreover, while plaintiffs Terrill and Brown did notify Electrolux of the alleged breach of warranty, they did not do so within a reasonable amount of time.  Plaintiff Terrill waited approximately six months to contact Electrolux regarding the alleged problem with his machine (Am. Compl. ¶ 13), while plaintiff Brown waited three years to do so (*id.* ¶ 14).  These delays are fatal to their claims, rendering them inadequate class representatives.  *See, e.g.*, *Tegen v. Chapin*, 187 N.W. 185, 187-88 (Wis. 1922) (fifty-seven day delay in providing notice was deemed unreasonable); *Schroeder v. Drees*, 83 N.W.2d 707, 709 (Wis. 1957) (seven months unreasonable); *Pollard v. Saxe & Yolles Dev. Co.*, 525 P.2d 88, 92 (Cal. 1974) (delay of four years in providing notice was unreasonable and therefore warranty claims failed); *Fieldstone Co. v. Briggs Plumbing Prods., Inc.*, 54 Cal. App. 4th 357, 370-71 (Cal. Ct. App. 1997) (finding that three-year delay was unreasonable as a matter of law).

Accordingly, all four plaintiffs fail as class representatives for plaintiffs' warranty-based claims.

## CONCLUSION

For the foregoing reasons, Electrolux respectfully requests that the Court enter an order denying plaintiffs' motion for class certification.

Dated:  January 15, 2010                          Respectfully submitted,

John H. Beisner                          s/ J. Russell Jackson
Jessica Davidson Miller                  J. Russell Jackson *(pro hac vice)*
Nina H. Ramos                            Peter D. Luneau
SKADDEN, ARPS, SLATE MEAGHER             SKADDEN, ARPS, SLATE MEAGHER
& FLOM LLP                               & FLOM LLP
1440 New York Avenue, N.W.               Four Times Square
Washington, D.C.  20005                  New York, New York 10036
(202) 371-7000                           Telephone: (212) 735-3000
                                         Facsimile: (212) 735-2000
                                         Email: russell.jackson@skadden.com
                                         Benjamin Brewton, Bar No. 02530
                                         TUCKER, EVERITT, LONG,

BREWTON & LANIER
P. O. BOX 2426
AUGUSTA, GEORGIA 30309
Telephone: (706) 722-0771
Facsimile: (706) 722-7028
E-mail: bbrewton@thefirm453.com


ATTORNEYS FOR DEFENDANT ELECTROLUX HOME PRODUCTS, INC.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 15th day of January, 2010, I have served a copy of the foregoing upon all interested parties in accordance with ECF rules by electronically filing the foregoing with the Clerk of Court using the CM/ECF system.

<div style="margin-left: 50%;">

/s/ J. Russell Jackson_____
J. Russell Jackson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
Email:  russell.jackson@skadden.com

</div>