IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| ROBERT BROWN and MICHAEL VOGLER, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>ELECTROLUX HOME PRODUCTS, INC., d/b/a FRIGIDAIRE,<br><br>                Defendant. | Case No:  CV-108-030 |

**PLAINTIFFS' POST-HEARING SUBMISSION**

On August 2, 2012, this Honorable Court heard oral argument from the parties on Plaintiffs' pending Renewed Motion for Class Certification. At the conclusion of the hearing, the Court invited post-hearing submissions from the parties, if desired. Plaintiffs submit this post-hearing brief to address several points and issues raised by the Court and the parties at the hearing. In no particular order, they are as follows:

1.      *Wal-Mart v. Dukes* **Did Not Change the Law**

Electrolux's chief argument at the class certification hearing was that Plaintiffs had not met the high commonality standard as articulated in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ---, 131 S. Ct. 2541, 2562 (2011). In order to satisfy the commonality requirement under *Dukes*, a claim "must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity

1

of each one of the claims in one stroke." *Id.* at 2551. Plaintiffs' claims clearly satisfy this requirement.[1]

## 2.     The District Court Order and Sixth Circuit Opinion in *Whirlpool*.

As expressed by Plaintiffs' counsel at the hearing, Plaintiffs believe that the Sixth Circuit's decision in *In re Whirlpool Corp. Front-Loading Washer Products Liability Litig.*, 678 F.3d 409 (6th Cir. 2012), strongly supports class certification in this case. In fact, Plaintiffs believe that this case presents an even stronger case for class certification because it involves washers that suffer from a single, discrete design defect—a "convoluted bellow," whereas *Whirlpool* involved washers that had design changes, different platforms, and varying remedial efforts and disclosures by Whirlpool over a nine (9) year period. *In re Whirlpool*, 678 F.3d at 414, 418-420.

Electrolux argued at the hearing that this case presents a weaker case for certification than *Whirlpool* because the class that was certified in *Whirlpool* was limited to the issue of liability, whereas Plaintiffs seek certification of their claims for damages as well. This difference appears to be a function of the impact of the economic loss rule on the different claims involved in the two cases.

The economic loss rule protects manufacturers of defective products from being held strictly liable in tort for damage to the product, including damages for diminution in the value of the product or the cost to repair to the product. *Seely v. White Motor Co.*, 403 P.2d 145, 148-152 (Cal. 1965); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex. 1977). Instead, such damages are recoverable only in connection with contract-based claims such as warranty claims or under statutes that permit recovery of such damages. Such damages do not appear to be available in connection with the claims that were certified in *Whirlpool* because those claims (*i.e.*, tortious breach of warranty, negligent design, and negligent failure to warn) all sounded in

---

[1] This is especially true because Fed. R. Civ. P. 23(a) "does not require that *all* questions of law or fact raised in the litigation be common." 1 H. Newberg & A. Conte, Newberg on Class Actions § 3.10, pp. 3-48 to 3-49 (3d ed. 1992).

tort. *In re Whirlpool*, 678 F.3d at 415.  That limitation is not present in this case, since damages for diminution in value or the cost to repair are available in connection with not only Plaintiffs' warranty claims, but also with their claim for violations of the Texas Deceptive Trade Practices Act. *Raye v. Fred Oakley Motors, Inc.*, 646 S.W.2d 288, 290-291 (Tex. Civ. App. 1983); *Salais v. Martinez*, 603 S.W.2d 296, 297 (Tex. Civ. App. 1980). In addition, Plaintiffs' claim for violations of the California Unfair Competition ("UCL") law permits recovery of injunctive relief and restitution. *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1088 (Cal. 2010); *Labrilla v. Farmer's Group, Inc.*, 119 Cal. App. 4th 1070, 1087-1088 (Cal. 4th App. 2004).

The cost to replace the defective bellows should not vary from class member to class member.  Thus, although "the presence of individualized damages issues does not prevent a finding that common issues predominate[,]" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), damages can be proven on a class-wide basis in this case.  Further, entitlement to relief available under the UCL, including injunctive relief requiring Electrolux to replace the defective bellows and restitution to the extent that it is necessary to prevent unjust enrichment, will depend entirely upon Electrolux's conduct and not upon any evidence unique to individual class members.  Accordingly, a class action is clearly the superior method for resolving this dispute.

If, however, the Court has any reservation about certifying a class that encompasses both liability and damages, *Whirlpool* teaches that certification of a liability-only class would still significantly advance the litigation and conserve judicial resources.  It cannot seriously be disputed that many of the core questions at issue in this case, such as "is the boot defective?" and "was Electrolux aware of the defect and failed to disclose it?," can be answered cohesively for all class members in one fell swoop, just as the district and appellate courts found in *Whirlpool*. Individual consumers should not be forced to present costly proof, including expert testimony,

3

on these common issues over and over and over again in hundreds or thousands of separate trials. Moreover, as noted at the hearing, the reality is that, absent certification, there will not be hundreds or thousands of individual lawsuits; there will be none:

> The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative-no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied-to no litigation at all.

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.).

Thus, to the extent that the Court has any reservations about certifying a damages class, certification of a liability class would still significantly advance the litigation and be preferable to no certification at all.

The Court also inquired at the hearing whether there are any significant differences between the law of the Sixth Circuit and the law of the Eleventh Circuit with respect to the certification of claims such as those involved in *Whirlpool* and the case *sub judice*. Plaintiffs respectfully submit that the Eleventh Circuit's decision in *Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011), indicates that there are not. In *Fitzpatrick*, the Eleventh Circuit agreed with the district's court's legal analysis in certifying a claim brought against the manufacturer of specially-formulated yogurt under Florida's Deceptive and Unfair Trade Practices Act, but remanded the case for clarification as to the class definition. *Id.* at 1281-1283. The Eleventh Circuit approved of the district court's predominance analysis as "sound," stating:

> In its reasoning that common issues predominated, the district court states that "the FDUPTA claim rises or falls based predominately on issues for which classwide proof is appropriate; an answer to the paramount question of whether YoPlus works as advertised will directly and substantially impact every class member's liability case and entitlement to relief under the FDUTPA." Order at 19. *See Klay*, 382 F.3d at 1255 ("Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's

4

entitlement to injunctive and monetary relief."").

*Id.* This decision demonstrates that the Eleventh Circuit is amenable to certification of claims similar to those presented in the case *sub judice* in appropriate cases.

3.   **Adequacy of the Class Representatives.**

At the hearing, there was some discussion about the adequacy of the class representatives, Michael Vogler and Robert Brown. As to Plaintiff Vogler, the Court inquired as to whether the fact that he did not begin to notice mildew and mold problems until eighteen (18) months after purchase affected his adequacy as a class representative. As stated at the hearing, Plaintiffs submit it does not. In fact, Vogler's experience is consistent with, and reflective of, the nature of the defective bellows, which traps water in areas that cannot be seen and eventually leads to the formation of mold and mildew in the ordinary course of using the machine.

As to Plaintiff Brown, there was discussion of whether Electrolux's offer to provide Brown a replacement bellows after he complained of problems with his washer affects his adequacy as a class representative. Again, Plaintiffs submit it does not. Among other things, Electrolux's offer was to "replace the bellow." (Dkt. No. 164 at 9.) Electrolux did not state that it would replace the bellow with a newly redesigned bellows that would cure the problem.

The Rule 23(a)(4) inquiry asks whether Plaintiffs Brown and Vogler will fairly and adequately represent the interests of the class. Brown and Vogler are similarly situated to the members of the putative class in that they all purchased washing machines with the defective bellows, and all were subject to the same warranties and non-disclosures. Further, Brown and Vogler have assisted in the prosecution of the case by providing documents and testimony and staying abreast of the litigation, thus fairly and adequately representing the interests of the putative class thus far. Finally, neither Brown nor Vogler has any conflict of interest that might undermine his ability to adequately represent the interests of the class going forward.

4.   **Ascertainability of Class Members.**

Respectfully, Electrolux's half-hearted contention in a footnote that there may be an ascertainability issue because there was a one-year period where it began phasing in a "new 'S'

5

shaped bellows without convolutions" is without merit. It is beyond dispute, as the record demonstrates, that a sophisticated manufacturer like Electrolux establishes and maintains model numbers and serial numbers on all products it makes from which information such as date of manufacture and part specification can be derived. Indeed, Electrolux's own Staff Engineer previously stated "of the approximately 1,336,008 Electrolux front load washers sold during th[e] [class] period, approximately 585,868 used a convoluted below . . . *Electrolux could use dates of manufacture to determine the bellow type of some machines, . . . .*" (*See* Electrolux's Initial Opposition, Dkt. No. 106, Ex. 11 (Hill Decl.) ¶9 (emphasis added); *see also id.*, Ex. 12 (Tumble Action Washer Warranty) and 14 (detailing washing machine product specifications)). Likewise, a sophisticated manufacturer like Electrolux knows when a change in parts and components is made to the products it makes and places in the stream of commerce. Thus, it should be possible to identify washers that contain the defective bellows simply by referring to the model and serial number of the machines.

Further, to the extent that any questions remain concerning whether a small subset of the washers contain the defective bellows, consumers can readily ascertain whether their machines contain the defective bellows simply by examining their machines, since the defective bellows has convolutions, whereas the "new 'S' shaped bellows does not have convolutions." (Plaintiffs' Renewed Motion, Dkt. No. 158, Ex. A; *Id.* at Ex. Q, Vogler depo., pp. 105-106.) Thus, ascertainability is no bar to certification in this case.

     5.     **Manifestation of the Defect.**

Electrolux argues that the fact that its records indicate that only a small percentage of customers have incurred warranty service calls for "mold, mildew, and odor" suggests that the defective bellows has not caused such problems for many class members. This argument is flawed for several reasons.

As a threshold matter, the statistic that Electrolux touts likely underestimates the number of individuals who experienced mold and mildew problems with their washers for several

6

reasons.  First, the statistic is limited to warranty service calls in which a service technician was actually dispatched (Electrolux's Opposition, Dkt. No. 164, Ex. 2, Hill Declaration, ¶6), and thus does not include complaints, emails, inquiries, letters, calls, etc. where a service technician was <u>not</u> dispatched, as was the case with the named Plaintiffs.[2]  Second, the statistic was generated from a search of Electrolux's electronic records using only a handful of limited search terms, and thus does not include consumers who called to complain about problems with their washer, but did not use one of the search terms.  Finally, the statistic is limited to warranty service calls that occurred within the one-year warranty period, and thus does not include consumers who did not experience a problem or contact Electrolux about the problem within a year of purchasing their washer—a significant omission given that typically mold formation occurs over time.[3]  Finally, as discussed at the hearing, there are myriad reasons why a consumer might not complain, including the fact that some folks just don't complain.[4]

---

[2] Electrolux's typical response to consumer complaints about mold, mildew, and odor has been to "wipe the inside of the machine with a towel after every wash cycle and. . . to leave the door of his machine open at all times when it is not in use, and [to] dry out the washer after every use with a town to attempt to avoid water-build up and further accumulation of mold and odor." First Amended Compl., ¶5.  Such "advice" on dealing with these problems caused by the design defect would not necessitate a service call.

[3] For these reasons, Electrolux's statistic is not an "apples to apples" comparison to the "35%" manifestation rate mentioned in the *Whirlpool* case, which was derived from a host of sources, including all forms of consumer complaints and even a survey initiated by Whirlpool, and which was hotly disputed by Whirlpool.  Further, even Electrolux concedes that "the plaintiffs' [in *Whirlpool*] best estimate [of 35%]" nonetheless resulted in a certified class that "consisted primarily of uninjured individuals."  (*See* Dkt. No. 175, Electrolux's Response to Plaintiffs' Supplemental Authority).

[4] Further discussion and analysis of why consumer complaint data will be under-inclusive of the actual extent of mold problems experienced by front load washer purchasers is found in the report of Dr. Richard Oliver in the *Whirlpool* litigation.  (Dkt. No. 93, Appendix 29 in *In re: Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 1:08-wp-65000, U.S. Dist. Ct. N.D. Ohio.)  Dr. Oliver speaks to consumer unfamiliarity with front load washers generally.  According to Dr. Oliver, "[i]ntroduced in the U.S. in approximately 2000, residential front-loaders were an innovative washer and its drawbacks were most likely unknown to consumers."

7

In addition, there is no requirement under Rule 23 that some arbitrary or magical number of warranty calls, emails, phone calls, complaints, injuries, etc., exist before a class can be certified. This issue is well beyond the scope of Rule 23 and irrelevant to class certification itself. *See Daffin v. Ford Motor Co.*, 458 F.3d 549, 550 (6th Cir. 2006) ("Although the class includes those owners who never actually experienced a manifestation of the alleged defect, the class certification was not an abuse of discretion because the class and the named plaintiff meet the elements of Federal Rule of Civil Procedure 23(a) and 23(b)(3)."). It is for this reason, and not because some arbitrary or magical threshold of calls or complaints was satisfied, that the courts in the *Whirlpool* case rejected this same argument and held that class certification was appropriate.

An argument similar to the one advanced by Electrolux was recently addressed by the United States District Court for Central District of California in the case of *Keegan v. American Honda Motor Co., Inc.*, No. cv 10-09508, --- F.R.D. ---, 2012 U.S. Dist. LEXIS 91394 (C.D. Cal. June 12, 2012). There, Honda argued that the plaintiffs' claims were not appropriate for class certification because the problem the plaintiffs alleged were caused by a defect in its vehicles had not manifested itself in every class member's vehicle, and because the problem allegedly could be caused by other sources. The court rejected this argument and certified the case to proceed as a class action.

With respect to the plaintiffs' disclosure-based claims, the court stated:

Defendants asserted in their briefs and at oral argument that to succeed on the CLRA claim, plaintiffs would have to prove that *each* class vehicle experienced premature or uneven tire wear as a result of the purported design defect. The court is aware of no case authority supporting this proposition. Indeed, the case

---

(*Id.* at p. 5.) "Because the predecessor top loaders were virtually maintenance free, it was likely that consumers either had never heard of biofilm or reasoned that it was an unlikely occurrence and not of their concern." (*Id.*)

8

law suggests the contrary. It mandates only that plaintiffs show there was a defect in the class vehicles that created an "unreasonable risk" of safety problems.

The CLRA prohibits the failure to disclose "material" facts. Here, whether class vehicles have a propensity or likelihood to experience excessive and premature tire wear, even if each one does not necessarily manifest the problem, will be a question of fact for the jury.

Moreover, plaintiffs' claim is not that each and every class vehicle exhibited premature and excessive tire wear; it is that as a result of the design defect, class vehicles had a likelihood of doing so, and that a reasonable consumer would have behaved differently had he or she known of this propensity. Defendants argue that plaintiffs will have difficulty proving this assertion. But it would be error to "equate a 'rigorous analysis' with an in-depth examination of the underlying merits. . . . The district court is required to examine the merits of the underlying claim in this context, only inasmuch as it must determine whether common questions exist; not to determine whether class members [can] actually prevail on the merits of their claims."

*Id.* at *75-78 (internal citations and footnotes omitted).

With respect to the plaintiffs' express warranty claim, the Court stated:

[T]he court concludes that plaintiffs have adequately demonstrated predominance with respect to the express warranty claim. That claim will succeed if plaintiffs are able at trial to show that all class vehicles are substantially certain to manifest the excessive and premature tire wear and loud and disruptive noise alleged in the complaint. It will fail if such evidence is lacking. As the Ninth Circuit has observed,

> "a court can never be assured that a plaintiff will prevail on a given legal theory prior to a dispositive ruling on the merits, and a full inquiry into the merits of a putative class's legal claims is precisely what both the Supreme Court and we have cautioned is not appropriate for a Rule 23 certification inquiry." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers Int'l Union, AFL–CIO v. ConocoPhillips Co.,* 593 F.3d 802, 809 (9th Cir.2010).

As noted, the *United Steel* court held that it was legal error for the district court to conclude "that merely because it was not assured that plaintiffs would prevail on their primary legal theory, that theory was not the appropriate basis for the predominance inquiry." *Id.* While class certification requires some analysis regarding the merits of plaintiffs' express warranty claim, the predominance problems defendants identify here are better resolved on the merits.

*Id.* at *91-94.

> Similarly, the Court certified the plaintiffs' implied warranty claim, stating:
>
> As with plaintiffs' express warranty claim, if defendants can demonstrate that the design specification requiring 1.5 degrees of negative camber is not "substantially certain" to result in the excessive and premature tire wear about which plaintiffs complain, they will prevail. If plaintiffs, on the other hand, can demonstrate that the specification is substantially certain to result in premature and excessive tire wear that renders the vehicles unfit for driving, they will prevail. The breach of implied warranty claim is therefore susceptible of common proof, and the court will certify the implied warranty claim for class treatment.

*Id.* at *96.

The same is true is true in this case.

### 6. The Elements of Plaintiffs' Claims Will Be Proven Through Common Evidence Applicable to All Class Members.

At the hearing, counsel for Electrolux repeatedly argued that Plaintiffs have not shown how the elements of their claims will be established through common proof. Respectfully, that contention simply disregards Plaintiffs' submissions on class certification. In both Plaintiffs' Renewed Motion/Memorandum (Dkt. No. 158, pp. 14-21) and Plaintiffs' Reply (Dkt. No. 165, *see, e.g.,* pp. 5-10 & 13-33), Plaintiffs discussed in detail the elements of their claims and the common proof that will establish those claims.

As stated at the hearing, the evidence that Plaintiffs intend to present at trial to prove their claims will be straight-forward and applicable to all class members. For instance, the implied warranty claims shared by each Plaintiff will stand or fall depending upon the answers to pivotal common questions including "is the boot defective?" and, if so, "will the defect result in mold and mildew formation under normal operating procedures rendering the machines unfit for cleaning clothes?" At trial, Plaintiffs will answer these questions through identical, common expert proof to be weighed by the trier of fact. And if the answer to those common questions is "yes," then class members have suffered a common injury and are entitled to common relief

10

sufficient to ensure they receive the benefit of their bargain.[5]

Likewise, Plaintiffs' claims under California and Texas consumer protection statutes share the common questions of "did Electrolux know about its defective boot and the problems resulting therefrom?" and, if so, "did Electrolux fail to disclose this information?" These questions will be answered through common proof (including Electrolux's internal documents and form materials provided to consumers) that will not vary among individual class members.

Of course, at this juncture, Plaintiffs do not have to prove that they will prevail on their claims; they merely must show that common issues exist and that they predominate over issues affecting only individual class members. As stated by the Sixth Circuit in *Whirlpool*:

> [T]he district court properly concluded that whether design defects in the Duets proximately caused mold or mildew to grow and whether Whirlpool adequately warned consumers about the propensity for mold growth are liability issues common to the plaintiff class. These issues are capable of classwide resolution because they are central to the validity of each plaintiff's legal claims and they will generate common answers likely to drive the resolution of the lawsuit.

*In re Whirlpool*, 678 F.3d at 419.

As in any class proceeding, it is certainly possible, and perhaps inevitable, that <u>some</u> individual issues may exist. But, at this stage, the relevant inquiry is whether common questions *predominate* over any individual questions that may exist, thus making a class action the most effective procedural mechanism for resolving this dispute. Plaintiffs' submit that common

---

[5] As discussed at the hearing and in Plaintiff's prior submissions, Electrolux's contention that each class member must prove individual notice to Electrolux misses the mark. If that were true, then no warranty class could ever be certified in California or Texas. As the cases cited by Plaintiffs demonstrate, that simply is not the case. Further, the question of whether individual notice must be shown by each absent class member is a common legal question that can be answered on a class-wide basis and, as previously discussed, there are serious questions as to whether notice to the manufacturer in these circumstances is even required at all. (Dkt. No. 165 at 13-21.)

questions predominate here.

### 7. The Case Law Discussed at the Hearing and in Supplemental Authority Papers.

The Court had several questions relating to specific cases directed toward parties at the class certification hearing. Plaintiffs present the paragraphs below explaining how these cases relate to the instant litigation.

- *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012). Plaintiffs in *Mazza* sought a nation-wide class of consumers under California law. *Id.* at 585. The plaintiffs in this case only seek two very specific state-wide classes. The Ninth Circuit reversed the class certification ruling finding that consumers did not receive misleading advertisements prior to purchase, and that a presumption of reliance "does not arise when class members were exposed to quite disparate information from various representatives of the defendant." *Id.* at 596. That is not the case, here. Plaintiffs and the class reasonably believed that the washing machines they purchased would be free of defects and clean their clothes. Instead, the washing machines contained a defective bellow (which Electrolux admits), and as a result, their clothes are washed with old, standing water and biofilm.

- *In re Ford Motor Co. E-350 Van Products Liability Litig.*, No. 03-4558, 2012 U.S. Dist. LEXIS 13887 (D.N.J. Feb. 6, 2012). In *Ford Vans*, the plaintiffs alleged that Ford's E-350 "15-passenger" vans were defectively designed due to a high center of gravity that leads to an unusually high rollover rate. The plaintiffs asserted a claim under the Texas Deceptive Trade Practices Act that was premised solely on Ford's alleged failure "to disclose to consumers that, due to stability issues, the E-350 van should only be driven by trained experienced drivers." 2012 WL 379944, at *24. The district court found that this claim was not appropriate for class certification for two essential reasons. First, the court noted that "the undisputed record in this case reveals that the safety instructions in E–350 owner's manuals changed throughout the proposed class period[,]" and concluded "[n]aturally, then, Plaintiffs cannot assert a uniform alleged omission, because differing amounts of information were disclosed at different times." *Id.* at 24. Second, "the Court agree[d] with Ford that Plaintiffs cannot present classwide proof of reliance or causation." *Id.* at 25. This finding was based upon decisions holding that "to satisfy the reliance element for an omission, a plaintiff must show that defendant had intent to induce a transaction through failure to disclose, and that plaintiff would not have entered into the transaction if the information had been disclosed." *Id.* Here, in contrast, there is no evidence of material changes in the information provided to class members prior to their purchase of their washing machines. In addition, this case presents a much stronger case for presuming reliance. In *Ford Vans*, it is not clear that no class members would have

12

purchased the vans if they had known that the vans should only be driven by trained experienced drivers due to stability issues. Here, in contrast, the sole purpose of a washing machine is to clean clothes and, consequently, a jury could reasonably find by a preponderance of the evidence that no class members would have purchased a washing machine if they had been told that the machine has a defect that causes water to accumulate and mold and mildew to develop in the machine, thereby defeating the machine's essential purpose of cleaning clothes.

- *Tietsworth v. Sears, Roebuck & Co.*,[6] 720 F. Supp. 2d 1123 (N.D. Cal. 2010). Defendants cite to this case for the proposition that pre-suit notice is a requirement for breach of warranty claims, and that class certification is improper because the warranty claims "involve elements that are individual to each purported class member, such as the provision of notice, an opportunity to cure, and reliance." *Id.* at 1147-48. However, *Tietsworth* analyzed notice with respect to the retailer, not the manufacturer with which consumers had no dealings or privity in making their purchases. *Id.* at 1130-31.

- *Stearns v. Select Comfort Retail Corp.*, No. 08-2746, 2009 U.S. Dist. LEXIS 48367 (N.D. Cal. June 5, 2009). This case, cited by *Tietsworth*, provides that "[t]imely notice of breach is not required where the buyers did not purchase the product from the manufacturer directly."

- *In re Microsoft Xbox 360 Scratched Disc Litigation*, No. C07-1121-JCC, 2009 U.S. Dist. LEXIS 109075 (W.D. Wash. Oct. 5, 2009). After receiving nearly 55,000 complaints from its customers that their Xbox videogame systems were ruining their game discs, Microsoft determined that user misuse was causing the problem, and started to put stickers on its machines warning its users not to move the machine with a disc in the tray. *Id.* at *7-8. Electrolux cited to this case to argue that "every single class member has to offer proof that the defendant was given notice of the alleged defect." However, this case failed as a class action because of predominance—it did not discuss the need to prove notice. *Id.* at *19-

---

[6] The subsequent *Tietsworth* decision, No. 09-cv-00288-JF(HRL), 2012 U.S. Dist. LEXIS 62956 (N.D. Cal. May 4, 2012), discussed the "over-inclusive" nature of plaintiffs' class definition, because newer machines might not have contained the defective circuit board in question, and it would be "unwieldy" to check every one of the 190,000 machines to tell if they had a new circuit board. Unlike in *Tietsworth*, Plaintiffs here do not base their claims on fickle electronic control boards, hidden inside the body of the machines and nearly impossible for an ordinary consumer to inspect, that could malfunction or manifest a defect sometime in the future: the convoluted bellows *are* defective (as acknowledged by Electrolux). (Dkt. No. 158, Ex. A.) Further, even if some of the model numbers identified by the Plaintiffs have a "new bellow," identification of the new bellow versus the old bellow is *not* an "unwieldy" process, as Defendant's records contain this information, and the different bellows are easily identified. *See Saltzman v. Pella Corp.*, 257 F.R.D. 471, 476 (N.D. Ill. 2009), *aff'd by* 606 F.3d 319 (7th Cir. 2010) (discussing how defendant's product was easy to identify by ordinary consumer).

13

20. Regardless, the issues in *Xbox* regarding predominance are not present in this case: because plaintiffs are not asserting a fifty-state class that would bring many different legal analyses into play (*id.* at *18), any "owner misuse" argument has already been flatly rejected by the Sixth Circuit's *Whirlpool* decision (*id.* at 21-22), and plaintiffs' claims here all relate to a company-acknowledged defect that existed at the time of sale (*id.* at 20-21). While Microsoft blamed the user for the scratched discs, Electrolux has already identified the common problem and the common solution to that problem.

- ***Strauss v. Ford Motor Co.***, 439 F. Supp. 2d 680 (N.D. Tex. 2006). This Texas case supports Plaintiffs' breach of implied warranty claim in Texas: "[a] product must be *unfit* for its ordinary purpose in order to breach the implied warranty of merchantability." *Id.* at 687. The court in *Strauss* stated that "[t]he sole purpose of a vehicle is to provide transportation," which could not be stretched" so as to require accommodating license plates. Here, Plaintiffs are not trying to "stretch" the sole purpose of a washing machine: to clean clothes. The formation of biofilm, mold, and mildew prevents clothes from becoming clean, rendering the Electrolux washing machines unfit for their ordinary purpose.

- ***McGown v. Bridgestone/Firestone, Inc.***, No. 05-cv-9, 2005 U.S. Dist. LEXIS 25598 (E.D. Tex. Oct. 18, 2005). Electrolux cites *McGown* for the proposition that notice is an essential element of a warranty claim. *Id.* at *8. But, *McGown* is not a class action and does not hold that each absent class member must give notice in order for a warranty claim to be certified to proceed as a class action. If this were the law, then no warranty class would ever be certified.

- ***Everett v. TK-Taito, LLC***, 178 S.W.3d 844 (Tex. App. 2005). In this Texas Deceptive Trade Practices Act case, owners of a certain brand of vehicle outfitted with allegedly defective buckles alleged that they did not receive the "benefit of the bargain" when they purchased their vehicles and would suffer cost-of-replacement damages. *Id.* at 849-50. In *Everett*, the plaintiffs never experienced the alleged defect, themselves, and could only speculate that it *could* occur sometime in the future. There is no speculation in the instant case: Plaintiffs are dealing with biofilm and despite taking efforts to eliminate it pursuant to Electrolux's instructions, they continue to experience problems with biofilm as a result of a common and uniform defect. (Dkt. No. 158 at 11-12.)[7]

---

[7] Indeed, an expert witness will be able to prove this on a class-wide basis. Plaintiffs have already submitted proof that following Electrolux's instructions have no effect on the formation of biofilm, and Electrolux's arguments that individual variances in environment and usage of the washing machine have already been rejected in the *Whirlpool* litigation. *See In re Whirlpool Corp.*, 678 F.3d 409, 419 (6th Cir. 2012). Plaintiffs will be happy to present an expert report, expert testimony, and engage in expert depositions based upon the schedule the Court sets after it renders its decision on class certification.

14

- ***Wilcox v. Hillcrest Memorial Park***, 696 S.W.2d 423 (Tex. App. 1985). In this non-class case, the court found that the buyer did not provide the seller an opportunity to cure a breach of warranty, if any. *Id.* at 424. The case also held that a buyer had to notify a distant seller of the breach, and notice requirements are not applicable only as between a buyer and his immediate seller. *Id.* at 425. Subsequent Texas state cases found that this case appeared in a long line of many that provided competing analysis as to whether a consumer needed to provide notice to a distant seller. *In re Air Bag Prods. Liab. Litig.*, 7 F. Supp. 2d 792, 804, n.18 (E.D. La. 1988).

## CONCLUSION

This case involves one very specific defect, identified by Electrolux, contained in specific models of Electrolux's machines, and brought on behalf of two specific classes of individuals in two states. Such a case, involving common questions of fact and law, plainly fulfills the requirements of Rule 23. For the foregoing reasons and the reasons stated in their briefing on class certification, Plaintiffs respectfully request that their renewed motion for class certification be granted.

Date:  August 13, 2012                                             Respectfully submitted,

/s/ Amy E. Keller
Kenneth A. Wexler (*pro hac vice*)
Edward A. Wallace (*pro hac vice*)
Amy E. Keller (*pro hac vice*)
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois  60603
Telephone:  (312) 346-2222
Facsimile:   (312) 346-0022
kaw@wexlerwallace.com
eaw@wexlerwallace.com
aek@wexlerwallace.com

John C. Bell, Jr.
Georgia Bar No. 048600
Lee W. Brigham
Georgia Bar No. 081698
BELL & BRIGHAM
457 Greene Street

        Augusta, Georgia  30903
        Telephone:  (706) 722-2014
        Facsimile:   (706) 722-7552
        john@bellbrigham.com
        lee@bellbrigham.com

        R. Brent Irby (*pro hac vice*)
        Charles A. McCallum, III (*pro hac vice*)
        MCCALLUM, HOAGLUND,
         COOK & IRBY, LLP
        905 Montgomery Highway, Suite 201
        Vestavia Hills, Alabama  35216
        Telephone:  (205) 824-7767
        Facsimile:   (205) 824-7768
        birby@mhcilaw.com
        cmccallum@mhcilaw.com