# In the United States District Court
# for the Southern District of Georgia
# Augusta Division

ROBERT BROWN, on behalf of
himself and all others
similarly situated,

    Plaintiff,

v.

ELECTROLUX HOME PRODUCTS, INC.
d/b/a FRIGIDAIRE,

    Defendant.

No. 1:08-CV-30

## ORDER

The Court gave Plaintiff Robert Brown the chance to show that mold, mildew, and odors were likely to be problems throughout the thousands of washing machines that could be covered by his proposed class. Dkt. No. 224. Brown located two alleged experts. Dr. Donald J. Reinhardt, a microbiologist, concluded that the problem "would be more or less universal"—based on mold samples taken from inside Brown's washing machine, which had been sitting unused for six years, most recently in storage. Joseph Manna, a washing-machine technician, said the problem will be universal, based on his experience working on 40 or 50 machines.

Defendant Electrolux Home Products, Inc.'s ("Electrolux") motions to exclude these opinions, dkt. nos. 235, 238, will be **GRANTED** for the reasons below.

**BACKGROUND**

Electrolux makes Frigidaire front-loading washing machines. Dkt. No. 224 at 1. These have rubber seals, or "bellows," to stop water leaks. Id. Frigidaires originally used "a convoluted bellow, which is not as smooth as the S-shaped bellow that is now available." Id. at 1-2. Brown bought a Frigidaire machine with convoluted bellows. Id. at 2. He claims convoluted bellows trap water, causing mildew, mold, and odors. Id. He found mildew in his machine. Id.

He brought suit. Id. He moved for class certification. Dkt. No. 158. This Court granted it. Dkt. No. 201. The Eleventh Circuit vacated and remanded. Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225 (11th Cir. 2016). Brown renewed his motion. Dkt. No. 219. The Court denied it, but opened discovery as to whether the defect Brown alleged is likely to manifest throughout his proposed class. Dkt. No. 224. Electrolux now moves to exclude two of the purported experts Brown has secured. Dkt. Nos. 235, 238. The parties have briefed the motions, which are now ripe for disposition. Dkt. Nos. 246-47, 252-53.

## LEGAL STANDARD

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under this Rule, "the trial judge must ensure that any and all [expert] testimony or evidence admitted is . . . reliable." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). "Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." Id. at 590.

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience . . . whether his preparation is of a kind that others in the field would recognize as acceptable.

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151 (1999).

"The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the . . . validity . . . of the principles that underlie a proposed submission." Daubert,

AO 72A
(Rev. 8/82)

509 U.S. at 594-95. "The objective of that requirement . . . is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152. To that end, the court asks whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003) (citations omitted).

## DISCUSSION

The expert opinions Brown offers will be excluded, at the very least because neither witness's methodology is reliable.

### I. DR. REINHARDT'S METHODOLOGY IS UNRELIABLE.

Dr. Reinhardt holds a Ph.D. in microbiology. Dkt. No. 246-1 at 26:16-18. He does not hold himself out to be an engineering expert and has not worked on product design. Id. at 27:7-18. Still, he testifies that "this class . . . are [sic] conducive to conditions that promote the mold and the yeast problem . . . and that it would be one that would be

AO 72A
(Rev. 8/82)

more or less universal."[1] Id. at 83:7-11. His methodology is unreliable.

Dr. Reinhardt's study had a sample size of just one machine with convoluted bellows—Brown's. He simply assumed that there would be no differences among the machines that could be part of Brown's class. Id. at 175:2-7. That alone is fatal to his testimony. Am. Honda Mot. Co. v. Allen, 600 F.3d 813, 818 (7th Cir. 2010) (per curiam) ("[A] sample size of one is rarely, if ever, sufficient.").

On top of that, Dr. Reinhardt knew Brown had not used his machine in six years—and that it had been in storage for a significant amount of time. Dkt. No. 246-1 at 40:2-7, 41:4-5. Dr. Reinhardt did not know anything about the machine's condition before or during storage. Id. at 41:20-42:14. He did not know whether there was standing water in the machine when the mold sample was taken. Id. at 58:11-13. He did not know whether the machine had ever been taken apart. Id. at 58:13-15. For that matter, he only ever saw the machine by photograph. Id. at 42:15-17.

There is no need to belabor the point. Dr. Reinhardt's ignored the circumstances pertinent to Brown's injury, then extrapolated his baseless conclusion to thousands of others.

---

[1] That "more or less" may be carrying a lot of weight. Dr. Reinhardt went on to say that he would consider ten-to-twenty-percent mold rates to be "high." Id. at 85:18-19.

See Rising-Moore v. Red Roof Inns, Inc., 368 F. Supp. 2d 867, 872 (S.D. Ind. 2005); cf. Accident Ins. Co. v. Classic Bldg. Design, L.L.C., 539 F. App'x 465, 467 (5th Cir. 2013) (per curiam) (upholding exclusion of expert testimony given "extremely attenuated timeline" where "the light fixture did not fall until four years after it was installed, and [the expert] himself did not examine the light fixture until two years after it fell."). His methodology is unreliable.

No matter, Brown says: Dr. Reinhardt's testimony was *actually* about "how [washing] machines create an ideal environment for the proliferation of mold, bacteria, and fungi." Dkt. No. 246 at 2. Dr. Reinhardt did testify that "[m]oisture is a major contributing factor to mold," alongside other obvious remarks about wetness and laundry. Dkt. No. 246-1 at 33:20-21; see also id. at 35:10-11 ("Moisture control is important to mold control . . . ."), 36:16-37:1 (granting that generally, "leaving wet laundry in a washing machine after a wash cycle for a long period of time would increase the moisture"), 37:2-15 (testifying that wiping down a washing machine "would be a moisture control measure" and properly ventilating a machine in a ventilated area "might certainly reduce [moisture]."), 38:4-7 (agreeing that humidity varies "depending on whether a washing machine [is] kept in a garage or outside or inside of a home"). But "expert" testimony

cannot be used to fancy up common sense. Jaquillard v. Home Depot U.S.A., Inc., No. CV 410-167, 2012 WL 527421, at *5 (S.D. Ga. Feb. 16, 2012).

There are points where Dr. Reinhardt offers deeper opinions that are independent of his flawed study. He opines, for instance, that the design of the convoluted bellows encourages mold growth. Dkt. No. 246-1 at 71:21-72:20. But his basis for this is just that "it's obvious that water is prohibited from freely draining." Id. at 74:8-9. (Not that he tested Brown's bellows to find out. Id. at 204:1-4.) To the extent he is right about the flaw being "obvious," this is inappropriate subject matter for expert testimony, as explained above. To the extent the defect is subtler, a microbiologist with no engineering expertise—who admitted to not having ever seen the bellows in person—is not the person to suss it out. Id. at 74:18-75:8. At the very least, not without using some sort of sound methodology. See id. at 153:19-54:9, 155:22-56:4 (describing controlled experiment Dr. Reinhardt sometimes does where retained water can be measured). Dr. Reinhardt's testimony must be excluded.

## II. MANNA'S METHODOLOGY IS NOT RELIABLE.

Manna is a high-school graduate and the owner of a laundry-equipment company, and has been a washing-machine technician for ten years. Dkt. No. 247-1 at 1; Dkt. No. 247-2

at 61:17-62:16. He has no experience with washing-machine design, manufacture, or testing. Dkt. No. 247-2 at 70:13-72:9. He does not know whether there are industry design standards for washing machines. Id. at 72:21-74:10. He proposes testimony based on his "experience and expertise, and review of the documents from this [case]." Dkt. No. 247-1 at 1. He seeks to testify that "if standing water is left in a front-loading washing machine at the end of a wash cycle, [it] . . . will inevitably lead to the growth of mold and mildews"—and that the bellows at issue here "allow[ ] for standing water to develop at the end of wash cycles." Id. at 1-2.

In his deposition, Manna quickly disavowed being an expert on mold. Dkt. No. 247-2 at 20:19-21:3. Indeed, the entirety of his testimony about it boiled down to that "every time water is held at the bottom of a rubber door gasket it will create mold, mildew and odors." Id. at 21:22-22:3. Once again, whether or not mold grows in standing water is well within the reach of common sense, and so cannot be the subject of expert testimony.

As for Manna's opinion that the washing machines in Brown's proposed class will hold water because of their bellows, well, it does not hold water. Manna never inspected Brown's machine. Id. at 22:17-19. He claimed that because he has "worked on thousands of washing machines," he "could see

8

from the black mold in [photographs of Brown's machine] that it was caused from water" in the bellows. Id. at 23:10-15. This is quite the inferential leap, and to Manna's credit, he readily admitted to being "uncertain" as to causation. Id. at 24:5-9; see also id. at 131:16-32:5 (discussing other possible causes of mold). Manna's testimony as to Brown's machine is clearly unreliable.

Manna does go on to say more broadly that he has worked on machines with convoluted bellows and knows that they "hold water at the end of the cycle and create mold." Id. at 25:5-7; see also id. at 88:1-8. Further, he claims that "Electrolux convoluted bellows specifically in [his] experience have all held water and created mold, every one of them in [his] experience." Id. at 97:20-98:1. But there are significant cracks in the foundation of Manna's testimony. Although he (very) roughly estimated that he has worked on 500 machines with convoluted bellows, he "guess[es]" that he has only changed about 40 or 50 Electrolux convoluted bellows that were holding water. Id. at 107:10-09:11, 114:20-15:1; see also id. at 111:8-14. And, when there is a moldy-bellows problem, Manna "just order[s] [a new bellows] before [he] even go[es] . . ., because [he] just know[s] it's going to need to be replaced." Id. at 132:15-17. He is "not really concerned with the reason why, unless it is from an outside source."

Id. at 132:17-19 (emphasis added). The narrowness of Manna's inquiry is a major strike against admissibility. See McGee v. Evenflo Co., No. 5:02-CV-259, 2003 WL 23350439, at *10 (M.D. Ga. Dec. 11, 2003) ("[A]n expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis—that is, the process of eliminating other possible diagnoses." (citation omitted)).

Manna's knowledge is not systematic, either. He has not generally surveyed Electrolux machines. Id. at 113:10-14:1. He has not done any sort of testing with bellows and water retention. Id. at 45:4-8. He has not measured the amount of water Electrolux bellows retain. Id. at 94:21-95:8; but see id. at 96:4-5 (describing convoluted bellows as holding "[a] lot and a lot more than any other.").

Lastly, Manna's insights are not grounded in a representative sample of Electrolux machines. He sees many machines because they have problems—and he often focuses in on the problems the owner raises. Id. at 112:7-15. His conclusion is therefore improperly based on a selective sample. See, e.g., In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prod. Liab. Litig., 214 F. Supp. 3d 478, 493 (D.S.C. 2016) ("All of the named plaintiffs certainly felt that something was wrong with their

Windows, and thus, focusing on these allegedly defective Windows would seemingly tend to overstate the incidence of Window problems in the overall population. Moreover, plaintiffs appear to indicate that the water testing focused on Windows that already exhibited signs of damage. This further suggests that the water testing overstates the likelihood of Window failure in the overall population." (footnote omitted)); Allgood v. Gen. Mot. Corp., No. 102CV1077, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) (Hamilton, J.) ("[S]amples must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured.").

Manna's experience may be quite well-suited to the everyday work of servicing and repairing washing machines. But it is not the sort of reliable methodology that can be used under Daubert. His testimony must be excluded.

**CONCLUSION**

Brown brought forward evidence that mold grows in water. But the Court already noted that this "simple claim" does not require expert testimony. Dkt. No. 224 at 4. What Brown needed to do was show that "a defect is very likely to emerge in all the washing machines at issue" in this case. Id. at 7. The opinions of Dr. Reinhardt and Manna presented here fall *very* far short of helping him do so. For the reasons above,

AO 72A
(Rev. 8/82)

Electrolux's motions to exclude the testimony of Dr. Donald Reinhardt, dkt. no. 235, and Joseph Manna, dkt. no. 238, are **GRANTED**.

**SO ORDERED,** this 10th day of July, 2017.

*[signature]*

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA